Dukfee, Judge,
delivered the opinion of the court:
This case is before us pursuant to a Congressional reference.[1] Plaintiff has conceded that due to the running of the statute of limitations,[2] it has no legal claim. The sole question before us, therefore, is whether or not plaintiff has an equitable claim in the sense that that concept has developed in our Congressional reference jurisprudence. Burkhardt v. United States, 113 Ct. Cl. 658, 84 F. Supp. 553 (1949).
Plaintiff, an Alaska corporation, was organized in 1953 in compliance with section 207 of the National Housing Act, as *812 amended, 12 U.S.C. § 1713, as amended (,1964 ed.) It was plaintiff’s purpose to become a mortgagor under a Federal Housing Administration (FHA) Commitment for Insurance. In February, 1953, an application for Mortgage Insurance was submitted to FHA by tbe Sparkman and McLean Company of Seattle, as the proposed mortgagee, and ¡by the sponsors of plaintiff as the proposed mortgagor. The ¡sponsors of the proposed mortgagor were set forth as W. A. Hushlight of Portland, Oregon and Cash Cole of Fairbanks, Alaska. The proposed project “Moorland Court” was to be located in Fairbanks, and to consist of “1 and 2 Story Frame Walk Up Garden Apartments,” comprising 200 units. It was planned that the project would be built on a site consisting of 15 acres in Fairbanks which the city had authorized for lease to Cole for 75 years.
On June 3, 1953, FHA issued a Commitment for Insurance for $2,556,300.00 in accordance with the Moorland Court application. The commitment outlined the terms for payment of the mortgage loan, and listed the various requirements that would be necessary for the sponsors, mortgagee, and mortgagor to comply with at the closing of the loan transaction and the insurance thereof by FHA. The commitment was by its terms effective for a period of 90 days from the date of its issuance unless renewed or extended by the Commissioner, and each 30 days after the original period was in fact thereafter extended until October 1,1954.
By letter of July 27, 1953, Cole requested permission of FHA to commence construction on the project prior to initial closing of the loan. The request was made on the ground that “it is very essential to do the excavating and in-ground concrete work before the close-down of winter. Completing this work will enable us to start work two or three months earlier next spring.” The letter further stated “that in the event the loan is not closed for any reason said work performed will be at a loss to ourselves.”[3] A further letter signed by Cole, as President of plaintiff, dated August 3, 1953 was sent to FHA. It again requested permission to commence construc *813 tion prior to closing the mortgage transaction and also stated that “All construction prior to the recordation of the insured mortgage is to be at the risk of the mortgagor.” Approval for advanced construction was thereafter given by FHA on August 31,1953, since the need for the project was urgent. The agreement as signed by Cole, stated in part: “All construction prior to the recordation of the insured mortgage is to be at the risk of the mortgagor.”
In the meantime, the proposed mortgagee, Sparkman and McLean Company, decided to withdraw from the project and assigned the FHA Commitment for Insurance to the Federal National Mortgage Association (FNMA), then a federally chartered instrumentality of the United States. FNMA, therefore, became the mortgagee. FNMA agreed to loan plaintiff the $2,556,300.00 upon fulfillment of certain conditions such as execution of note and mortgage, a surety bond, title insurance, and a legal opinion concerning the validity of plaintiff corporation. FNMA did not object to the FHA authorization to commence construction prior to the FHA closing.
On September 1,1953, at the initial meeting of directors of plaintiff, the directors authorized execution of the prior-owned Cole lease with the City of Fairbanks for the land for the project.[4] Thereafter, plaintiff entered into a contract for the construction of the project with a construction group. The contractors commenced work on the project, and in the remainder of the 1953 construction season, completed a substantial portion of the site preparation, excavation and foundation work for the apartment buildings, as well as completing a substantial portion of a commercial building which was part of the project.
At that juncture, it appeared that all that remained for completion of the project was the formal closing'of the FHA commitment. However, in early November of 1953, there arose an intracorporate controversy between Cole and Kush-light over control of plaintiff. As a result of the controversy, each group held special meetings relieving the other group of any corporate authority. Thereafter, both groups executed *814 notes and mortgages on behalf of plaintiff to FNMA. The parties, realizing that a settlement of the dispute would be necessary if the construction were to continue in the spring of 1954, attempted to settle their differences, but to no avail. As part of the settlement attempt, the Rushlight group wrote the Cole group:
One final thing about which we are deeply concerned is that reports from Washington indicate that there may be very restrictive legislation in the immediate offing on FNMA projects, and if some kind of an agreement is not made soon so that this loan can be closed we may lose the only source of financing this type of a project.
The FHA in both late January, 1954 and late February, 1954, refused to proceed with the closing until plaintiff’s family feud was settled. FHA took the position that since it was not clear that there was then a legally constituted board of directors authorized to act for plaintiff, nor clear who were the legal officers of plaintiff, that FHA should not decide at its peril the faction to be recognized. Our trial commissioner found, and we agree, that FHA’s actions were reasonable.
On April 2,1954 a special meeting of the Rushlight group was held in an attempt to correct the corporate deficiencies that FHA objected to. It was stated at the meeting that mortgage commitments had been made “which have been extended from month to month but there is no assurance how long those extensions may be given.”
As a result of the resolutions and business conducted at the meeting held by the Rushlight group, FHA concluded that Rushlight validly controlled the corporate plaintiff, and appeared ready to effectuate the closing. However, the FNMA. Los Angeles Agency Counsel, Mr. Swanson, was not satisfied that the case was ready for closing. Swanson felt that FNMA was entitled to have a properly constituted mortgagor execute the note and mortgage, and as of then (April 20, 1954) there was still a difference between the two factions as to who controlled and spoke for the corporation. Swanson therefore refused to give the required legal opinion, approving the note and mortgage. Our trial commissioner found, and we again agree, that. Swanson’s position was reasonable.
*815 Negotiations thereafter Continued between the dissident factions within the corporate plaintiff in an attempt to resolve their differences. At the same time, FNMA Attorney Swanson attempted to iron out certain differences between the parties and the official FNMA position, so that FNMA could give its assent to the final closing.
In the meantime, on July 23, 1954, the National Housing-Act, as amended, was further amended by the National Housing Act of 1954, effective August 2,1954 (68 Stat. 590). The amending legislation imposed additional requirements upon corporate mortgagors seeking insurance under section 207, and prohibited further loans by FNMA on such housing projects as was herein involved, unless such loans were made on commitments which were outstanding prior to August 2,1954. However, under the National Housing Act of 1954 and the rules and regulations of FHA promulgated thereunder, FHA was authorized to grant extensions and renewals of pre-August 2,1954 commitments for insurance. The only source of financing the housing project here involved was a direct FHA insured loan from FNMA.
On September 21,1954 FNMA wrote the FHA director in Alaska stating that the FHA commitment for insurance would expire on October 1, 1954 and that “As it will not be possible to complete the closing by that date, we shall appreciate your granting a further extension to November 1,1954.” However, by letter of September 24,1954, the FHA director advised FNMA that no further extensions could be given until the new rules and regulations necessitated by the passage of the 1954 Act were received from Washington, D. C.
On October 1, 1954 the FHA commitment expired. The FHA Alaska director took no further action with respect thereto until the receipt by him of the agency’s new rules and regulations. However, even after receipt of this data the director was unclear as to how to proceed in plaintiff’s case, i.e., whether the project would have to be reprocessed entirely or not. At the same time that the FHA Alaska director was struggling with interpretation of the regulations, he felt it necessary to reinvestigate the need for plaintiff’s housing in the Fairbanks area. A market analysis of the area showed no need for the housing, and FHA on February 11, 1955 *816 determined not to extend the commitment. FNMA then cancelled the loan authorization, and plaintiff never completed the project, thereby losing all monies expended on the project, which totaled $351,368.82 including indebtedness to the contracting company.
On June 21,1955, plaintiff commenced a civil action in the United States District Court for the District- of Oregon against Norman P. Mason, as Commissioner of FHA, which action was assigned Civil No. 8147, in which plaintiff claimed that FHA’s refusal to renew and extend its commitment constituted a breach of contract for which plaintiff was entitled to damages.
In an opinion rendered February 5, 1959 (as amended March-16, 1959), District-Judge East decided that plaintiff was not entitled to recover. The court held:
As of August 2,1954, there was no final binding commitment between the parties -to insure any mortgage loan transaction initiated by the plaintiff. The defendant’s later decision that it would not again extend the original 90-day commitment for insurance and would not, in effect, insure any loan the plaintiff might acquire, was a decision” entirely within, the defendant agency’s discretion and prerogative. The defendant did, iff fact, to the Court’s mind, give the plaintiff ample opportunity to arrange its affairs and close a mortgage loan transaction agreeable to the defendant.
From a careful reading of all the evidence presented, it'appears to- the Court that, although no legal liability fastens on the defendant agency for the moneys expended by the plaintiff, it is evident that certain officers of the Federal Housing Administration and the Federal National Mortgage Association led the plaintiff into a false sense of security.
However, the court reserved judgment concerning an inspection fee which plaintiff had paid to FHA. Subsequently, the unused portion of-the inspection fee in the amount of $12,000 was returned to plaintiff by FHA, and the district court action was dismissed with prejudice on a stipulation dated March 2:6,1959.
On December 12, 1961 plaintiff brought suit in this court for the total amount expended for the unsuccessftd'project,■ plus its indebtedness resulting therefrom. As previously *817 stated, plaintiff concedes it . has no legal claim. We must therefore now examine the broader equitable facets of plaintiff’s claim. We determine in that connection whether the nation owes a debt in the broad moral-sense. Under the facts of this case, we do not believe such a moral debt exists, and hold that plaintiff has no equitable claim.
Recovery cannot be given even on an- equitable basis for two critical reasons. First, plaintiff specifically assumed the risk of loss, and second, the original commitment never closed due to plaintiff’s fault — not defendant’s.
The assumption of risk barrier is self-evident. Plaintiff believed it advantageous to-construct-the foundation prior to the winter season, so plaintiff took the initiative and requested permission to commence construction on the project prior to closing. As an inducement and guarantee to FHA, plaintiff included with the request the statement, “that in the event the loan is not closed for any reason said work performed will be at a loss to ourselves.” A later request stated, “All construction prior to the recordation of the insured mortgage is to be at the risk of the mortgagor.” The actual agreement granting permission to plaintiff, as signed by FHA and plaintiff, contained the above exact words of the later request. Under the bargain, plaintiff received the right to construct early and in turn, guaranteed to absorb any losses. No evidence was presented to show that plaintiff did not realize the implication of such a guarantee, or that plaintiff did not agree to it with its eyes wide open.
Recovery would be doubtful, however, even if plaintiff had not assumed the risk of loss, since the failure to close the commitment and loan was entirely plaintiff’s fault. The intracorporate controversy and struggle for power laid open the corporate nerve and made FHA chary of formally closing the agreement until the necessary mending was accomplished. Such a position was quite reasonable since at that time it was neither clear who were plaintiff’s legal officers and directors, nor who had the power to legally bind plaintiff. FHA certainly could not have been expected to decide at its peril which of the warring factions to recognize.
Further, both groups within plaintiff recognized the danger of non-reconciliation. Soon after the controversy arose *818 the Rushlight group informed the Cole group that “* * * if some kind of an agreement is not made soon so that this loan can be closed, we may lose the only source of financing this type of a project.” At an April meeting of the Rush-light group it was stated “* * * there is no assurance how long those extensions [FHA commitment' extensions]. .may be given.” The warring groups, however, did not or were unable to settle their differences, even though they recognized the dangers of their continuing course of action.
By the time FHA finally concluded that the Rushlight group controlled the corporation, plaintiff ran awry of the FNMA attorney, Swanson. Swanson refused to approve the note and mortgage, taking the position that FNMA was entitled to have a properly constituted mortgagor execute the note and mortgage, and that at that time (April, 1954) there was still a controversy as to which faction controlled the corporation. This position was quite similar to the original FHA position concerning the validity of the corporate makeup, and was likewise reasonable.
The brief summary of the situation as it then existed was that both FHA and FNMA had taken reasonable positions in withholding approval of the closing until the corporate differences were resolved. Plaintiff’s factions had clear knowledge of these positions, and yet were unable to resolve their differences.
By the time the differences were resolved to the satisfaction of both FHA and FNMA, a new housing law had gone into effect. The implementation of this law further delayed the project, through no fault of plaintiff, FHA or FNMA. Finally, FHA via a market analysis decided there was no longer a need for the project, and determined in a valid exercise of administrative discretion, not to extend the agreement. FNMA then naturally cancelled the loan authorization.
Nowhere has plaintiff shown that it was treated unfairly.[5] On the contrary, plaintiff was given every opportunity by FHA and FNMA to resolve the intracorporate differences, and yet failed to do so. If plaintiff’s investors had been able to settle their own differences, rather than to continually *819 baggie and jockey for financial position, FHA and FNMA would not have been reluctant to finalize the agreements, and presumably the transactions could have been formally closed to the satisfaction of all concerned. FHA and FNMA at all times acted reasonably. Plaintiff did not.
Accordingly, on all the facts and circumstances contained in the record, and upon the findings of the commissioner which we have reviewed, and in which we concur, we conclude that plaintiff has not stated a claim, either legal or equitable, against the United States.[6]
This opinion, together with the findings of fact of Commissioner Saul Bichard Gamer, which are herein adopted, will be certified to the Congress pursuant to Senate Resolution 144,87th Congress, 1st Session.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Saul Richard Gamer, and the briefs and argument of counsel, makes findings of fact as follows:
1. Since August 31, 1953, plaintiff has been and now is a corporation organized and existing under and by virtue of the laws of the Territory and State of Alaska. Plaintiff was incorporated in compliance with Section 207 of the National Housing Act, as amended, and the Administrative Rules and Regulations in effect thereunder on June 3, 1953. It was plaintiff’s purpose to become a mortgagor under a Federal Housing Administration (FHA) Commitment for Insurance.
2. (a) On February 5,1953, an Application for Mortgage Insurance was submitted to FHA by the Sparkman and McLean Company of Seattle, Washington, as the proposed mortgagee and by the sponsors of plaintiff as the proposed mortgagor. The proposed mortgagee stated it was interested in making a loan to the proposed mortgagor in the principal amount of $2,673,000. The sponsors of the pro-, posed mortgagor were set forth as W. A. Rushlight of Portland, Oregon, and Oash Cole of Fairbanks, Alaska. The proposed project, “Moorland Court,” was to be located in *820 Fairbanks, Alaska, and to consist of “1 and 2 Story Frame Walk Up ‘Garden Apartments,” comprising 200 units.
(b) It was planned that the project would be built on a site consisting of 15 acres in Fairbanks which the city had, pursuant to an Ordinance duly adopted on October 30, 1950, and approved by referendum held on December 12, 1950, authorized for lease to Cole or his assignees for 75 years.
3. On June 3, 1953, FHA, by the Federal Housing Commissioner, issued a Commitment for Insurance in accordance with the above-mentioned application, the project being designated as Project No. 130-00019. Said commitment provided in part, as follows:
This Administration, having considered your application and exhibits submitted therewith for the insurance of a mortgage upon the above project, finds said project to be eligible for insurance under die provisions of Section 207 of the National Housing Act, and Administrative Hules and Regulations thereunder now in effect. Subject to such Rules and Regulations and to the following conditions, the Commissioner will endorse as insured (but only to the extent of advances approved by the Commissioner) an original credit instrument, secured by a first mortgage upon the land and property included in the project, as hereinafter identified, in an amount not to exceed $2,556,300.00 * * *.
The commitment outlined the terms for the payment of the mortgage loan and listed the various requirements that would be necessary for the sponsors, mortgagee, and mortgagor to comply with at the closing of the loan transaction and the insurance thereof by FHA. The commitment was by its terms effective for a period of 90 days from the date of its issuance unless renewed or extended by the Commissioner, and each 30 days after the original period was in fact thereafter extended to and including October 1,1954.
4. By letter dated July 27, 1953, co-sponsor Cash Cole requested permission of FHA to commence construction on the project prior to initial closing of the loan. The letter was as follows:
We are requesting permission to start construction on the above project even though the case is not actually closed. If permission is granted, it will be assumed that it will be subject to the following conditions:
*821 1. No foundations will be poured without first obtaining the approval of the local FHA inspector.
2. That we are proceeding at our own risk and that in the event the loan is not closed for any reason, said work performed will be at a loss to ourselves.
3. Prevailing wage records will be maintained in accordance with your requirements.
This request is being made because of the delay we are experiencing in completing the final mechanical plans and specifications and the fact that it is very essential to do the excavating and in-ground concrete work before the close down of winter. Completing this work this year will enable us to start work two or three months earlier next spring.
5. Presumably the Cole request letter of July 27, 1953, did not meet FHA requirements and, following a telephone conversation on July 31, 1953 between the Territorial Director of FHA at Juneau, Alaska, and the vice president of the Washington Mortgage & Insurance Company, Inc., of Seattle, Washington, a Washington corporation which was selected by the sponsors to provide servicing for the mortgage loan transactions, the latter, by letter of August 3,1953, forwarded to the Director a letter agreement signed by Cole as president of plaintiff, again requesting permission to commence construction prior to closing the mortgage transaction upon plaintiff’s agreement, among other things, that “All construction prior to the recordation of the insured mortgage is to be at the risk of the mortgagor”; that all work would be subject to FHA inspection; and that releases of liens by all subcontractors would be furnished at the mortgage closing. Appended was a consent by the Sparkman and McLean Company, the proposed mortgagee, which also agreed, among other things, that all liens would be discharged before it made any advances on the mortgage.
6. (a) Approvals for advance commencement of construction were required to be given by the FHA Commissioner’s Office in Washington, D.C., and, by telegram of August 4, 1953, to Washington, the FHA Alaska Territorial Director recommended such approval, stating “Project meets all criteria for this procedure as outlined Rental Housing Letter 123, Section IV, Paragraph 1,” and that the “critical consid *822 eration” was the short remaining period of the Fairbanks construction season.
(b) Said Kental Housing Letter 123, Section IY, Paragraph 1, provided as follows:
1. Commencement of Construction: Construction must not commence prior to formal closing and recordation of the insured mortgage except with the prior approval of the Assistant Commissioner, Kental Housing, and subject to such conditions as he may impose and in no event before the determination of prevailing wages by the Secretary of Labor has been received and delivered to the mortgagor. Such approval may be given only in the event drawings and specifications and other necessary exhibits are agreed upon by the FHA, the sponsors, and the mortgagee in sufficient detail as to reveal clearly construction requirements adequate for the purposes of compliance inspection, and then only provided the Director recommends approval because (1) the need for the housing to be produced is immediate and urgent and is otherwise not being provided, or (2) the sponsors are ready, willing and able to close but, due to a backlog or other delays within the FHA office, the sponsors are being delayed in commencement, through no fault of their own, and immediate commencement is highly desirable due to approaching weather or other conditions, or (3) the best interest of the Commissioner -will be served by commencing construction prior to closing. This procedure contemplates that authorizations to commence construction prior to closing will be infrequent exceptions to the general rule and policy requiring closing prior to commencement of construction.
7. By letter of August 5,1953, to the Territorial Director, the Assistant Commissioner of FHA, based on the Director’s recommendation, authorized the Director to grant permission for the commencement of construction prior to the closing of the mortgage loan provided a letter agreement, in slightly revised form, was executed not only 'by plaintiff but also by the construction contractor, and which contractor would also be obliged to execute another required form (relating to construction operations).
8. On August 18, 1953, the City of Fairbanks, upon the instruction of Cole (which instruction, together with Cole’s execution of the lease for plaintiff, was deemed by the city authorities to constitute an assignment), leased to plaintiff *823 (although it had not yet been formally incorporated) the aforesaid 15 acres for 75 years. Cole executed the lease as president of plaintiff.
9. On August 21, 1953, the FHA Director in Alaska forwarded to the Washington Mortgage & Insurance Company the required forms for execution by the necessary parties “in order that we may give approval for construction prior to closing.”
10. On August 24,1953, the project co-sponsors Cole and Rushlight entered into a “Memorandum of Agreement” whereby they agreed, among other things, that plaintiff would be formed as an Alaskan corporation; that the Rush-light Automatic Sprinkler Company, an Oregon corporation, would own 95 percent of plaintiff’s stock, the remaining 5 percent to be held by the qualifying directors of plaintiff ; that Cole would turn over to plaintiff all his rights to his lease with the City of Fairbanks; and that Rushlight would: (a) cause to be formed, to construct the project, a syndicate which would include said Rushlight Automatic Sprinkler Company, the A. G. Rushlight Company, also an Oregon corporation, and the Tice Electric Company, a partnership; (b) cause said syndicate to enter into a contract of employment with Cole whereby Cole would be paid $100 a month commencing September 1953 until the completion of construction plus 25 percent of that portion of the syndicate’s profit on the construction which exceeded 10 percent; and (c) cause plaintiff to enter into a project management contract with Cole at compensation of 5 percent of the gross rentals. The agreement was contingent upon the construction of the project.
11. On August 25, 1953, the proposed mortgagee, Spark-man and McLean Company, evidently deciding to withdraw from the project, assigned FHA’s Commitment for Insurance to the Federal National Mortgage Association (FNMA), then a federally chartered corporate instrumentality of the United States and a constituent agency of the Housing and Home Finance Agency (HHFA), to which corporate instrumentality plaintiff had applied for a mortgage loan. Said assignment was accepted by FNMA, thereby making FNMA the proposed mortgagee.
*824 12. Since FHA’s authorization to commence construction prior to the closing of the mortgage loan was subject to the consent of the mortgagee (as well as to the payment of the FHA inspection fee) and since FNMA had become the proposed mortgagee, it was now necessary to obtain FNMA’s consent. By letter of August 26, 1953, to FNMA’s Los An-geles Office, the Washington Mortgage & Insurance Company-sought such consent as well as a formal issuance by FNMA of its mortgage loan authorization. The letter requested expedition since “the sponsoring corporation is very anxious to get under construction before winter,” but further stated that plaintiff did not feel justified in paying the FHA inspection fee involved ($12,781.50) until receipt of FNMA’s loan authorization and consent to the commencement of construction. The letter stated, among other things, that “the sponsoring corporation is in a position to proceed with construction,” that “Numerous attempts have been made to secure interim and permanent financing, with no success,” that Fairbanks was a critical defense area and with current expansion of military installations, “living conditions in the area grow more acute.”
13. By letter of August 28, 1953, FNMA issued its loan authorization, the letter stating in part as follows:
Federal National Mortgage Association hereby authorizes'a loan to Moorland Court, Inc., Fairbanks, Alaska, based upon a Commitment for Insurance (FHA Project No. 130-00019) under Section 207 of the National Housing Act, as amended, in the amount of $2,556,300.00,. dated June 3,1953, issued by the Juneau, Alaska Office of Federal Blousing Administration to Sparkman and McLean Company, Seattle, Washington, properly assigned to and accepted by Federal National Mortgage Association on August 25,1953. The loan shall be in an amount subject to conditions, delivery of documents and deposits of funds hereinafter set forth: * * *
Included in the conditions and the documents to be delivered were (a) the execution by plaintiff of a note and a mortgage in specified form, (b) the submission of appropriate resolutions of plaintiff’s board of directors authorizing the execution of the required documents, (c) a 100 percent surety bond covering the construction contract, guaranteeing completion *825 and payment of all obligations, (d) a title insurance policy, (e) a legal opinion concerning the validity of the plaintiff corporation and of its documents, and (f) approximately $200,000 in cash for project construction purposes over and above the mortgage loan. The letter closed by stating that, in view of the urgency of the situation as set forth in the letter of August 26, 1953, FNMA would not object to commencement of construction prior to the closing of the mortgage loan provided that FHA consented to such arrangement.
14. (a) On August 31, 1953, plaintiff was duly incorporated.
(b) On the same day, the required letter agreement in the form specified by the Assistant Commissioner of FHA, and executed by plaintiff as mortgagor (by Cole as its president) by “Moorland Contractors” (by Rushlight), as the construction contractor, and by Sparkman and McLean Company, as mortgagee, was presented to the FHA Director in Alaska. Moorland Contractors was a joint venture consisting of Rushlight Automatic Sprinkler Company, A. G. Rushlight & Company, and Tice Electric Company, and was recently organized for the purpose of constructing the housing project. Said agreement read in part as follows:
The undersigned, being the proposed mortgagor and the contractor in connection with the subject project, respectfully requests the permission of the Federal Housing Administration to commence construction prior to the closing of the mortgage transaction.
It is agreed that in consideration of such permission being granted, it will be upon the following terms and conditions:
1. All construction prior to the recordation of the insured mortgage is to be at the risk of the mortgagor.
2. Federal Housing Administration will be notified of the date when construction is to commence, in order to permit the assignment of a construction inspector. Such facilities as are required for the construction inspector will be made available.
3. A release of liens will be furnished by the contractor and by each subcontractor who performed any work or services to the project, such release to *826 be delivered to the mortgagee at the closing of the mortgage transaction.
4. It is understood and agreed that no work shall be commenced on construction of this project until such plans and specifications as may be deemed by the Federal Housing Administration to be sufficient to cover the work to be done prior to execution and recordation of the insured mortgage and the closing of the transaction have been filed with and accepted by the mortgagee and the Federal Housing Administration and that no work on the project shall proceed beyond that indicated on such plans and specifications filed with and accepted by the mortgagee and the Federal Housing Administration until complete plans and specifications for the entire project have been approved and accepted by all parties.
5. No construction shall be commenced prior to execution of FHA Form No. 2482 by the contractor nor except pursuant to a current prevailing wage determination by the Secretary of Labor.
6. The inspection fee set forth in the Commitment for Insurance has been paid.
(c) On the same day, said Director issued a letter (dated, for some unexplained reason, August 24, 1953) authorizing plaintiff to commence construction prior to the closing of the mortgage transaction. Plaintiff had at that time met the requirements set forth in Rental Housing Letter 123, which were contained in its letter agreement request to proceed with construction prior to the closing of the mortgage transaction.
15. (a) Plaintiff's articles of incorporation provided that plaintiff’s board of directors should consist of three directors and named Cash Cole, Tom Cole (his son) and Ruth Cole (his wife) as the initial board to serve until the first annual stockholders’ meeting. However, the initial bylaws of the plaintiff which were adopted on September 1,1953, provided that the directors of the corporation should consist of not less than three nor more than five directors, and at the first meeting of the shareholders on September 1,1953, there were purportedly elected as directors the following five persons (despite, the fact that the articles provided that the board should consist of only three directors) : Herbert C. Hardy (a Portland, Oregon, attorney representing Rushlight), A. L. Funk, Cash Cole, Ruth M. Cole, and Tom Cole. At the initial meeting of the directors, also held on September 1,1953, Cash *827 Cole was elected president of the corporation, A. L. Funk, vice president, and Ruth M. Cole, secretary-treasurer. At this meeting the directors also authorized the execution, by the president and secretary, of a lease with the City of Fairbanks and a construction contract “with Rushlight Automatic Sprinkler Co., A. G. Rushlight Company and Tice Electric Company, doing business as Moorland Contractors, Inc.” for the construction of the project.
(b) Plaintiff’s articles of incorporation authorized the issuance of 100 shares of preferred stock to the FHA and the issuance of 1,000 common shares of a par value of $5 per share. On or about September 1, 1953, the common shares were issued as follows: Rushlight Automatic Sprinkler Company, 996 shares; Herbert C. Hardy, 1 share; Cash Cole, 1 share; Ruth Cole, 1 share; and Tom Cole, 1 share. Rush-light Automatic Sprinkler Company had issued its check to the plaintiff dated August 28, 1953, in the sum of $4,980, the amount that would be due for 996 shares at $5 per share.
16. (a) On September 2, 1953, plaintiff entered into a contract with Moorland Contractors for the construction of the 200-unit apartment house project. Such contract, which was on a standard FHA approved form, called for a total contract price not to exceed $2,535,801.
(b) On the same day, Tom Cole, Funk, Ruth Cole, and Hardy submitted their resignations as directors, to take effect as soon as convenient to the board of directors.
17. In the Fairbanks, Alaska, area, it is as a practical matter only possible to carry on construction work of the type covered by plaintiff’s construction contract, especially the excavation and foundation work, during the approximate period of late spring to about the third week of November of each year.
18. (a) Immediately after the execution of the construction contract, Moorland Contractors commenced its work thereunder, and in the remainder of the 1953 construction season completed a substantial portion of the site preparation, excavation and foundation work for the apartment buildings, as well as completing a substantial portion of a commercial building which was part of the project, including the flooring and roofing thereof. In so doing, the con *828 tractors followed the plans and specifications which had been approved by FHA hi connection with the issuance by FHA of its authority for commencement of construction. All construction work was inspected by an inspector assigned to the pro] ect by FHA.
(b) If the authorization to commence construction prior to the closing of the mortgage transaction had not been issued, construction could not have commenced until spring 1954, and said project could not have been completed until sometime in the fall of 1955.
19. In early November 1953, there arose an intracorporate controversy between Cash Cole and Kushlight over control of plaintiff. Cole contended, among other things, that Kush-light had not advanced, pursuant to the Cole-Kushlight agreement, the $236,000 “front money” required under plaintiff’s letter agreement with FHA, and further that the August 28,1953, check to plaintiff issued by Kushlight Automatic Sprinkler Company in the sum of $4,980 did not turn out to constitute consideration for the 996 shares of stock issued to the company since plaintiff had been required to use part of said amount to pay the rent due under the lease with the city, an obligation which Cole maintained Kushlight had previously agreed his company or Moorland Contractors would assume.
20. On November 10, 1953, the three Coles purported to hold a special meeting of the stockholders of plaintiff in Fairbanks. At the meeting they adopted resolutions (a) authorizing plaintiff’s president or vice president, and plaintiff’s secretary, to execute a promissory note and mortgage, as well as all other required documents, in connection with the project; (b) authorizing the cancellation by the board of directors of the stock certificate for 996 shares of common stock issued to Kushlight Automatic Sprinkler Company “for the reasons that said company had failed to abide by its agreement to advance $236,000.00 front money to secure the commitment for a loan from the Federal Housing Administration in the sum of $2,535,801.00, and had also failed to pay the sum of $4,980.00, the subscription price of the 996 shares of stock of Moorland Court, Inc., for which it had subscribed,” and (c) authorizing the cancellation by *829 the board of the stock certificate for one share issued to Herbert C. Hardy for failure to pay for it. Immediately following the stockholders’ meeting, the three Coles purported to hold' a directors’ meeting at which the resignation of A. L. Funk as vice president and director was accepted, Tom Cole was elected vice president, Herbert C. Hardy was removed as a director, and Bailey E. Bell of Anchorage, Alaska, and Warren A. Taylor of Fairbanks, Alaska (Coles’ attorneys), were elected directors to replace Hardy and Funk, respectively; Further, resolutions were adopted canceling the 996-share Rushlight Automatic Sprinkler Company stock certificate and the one share of stock held by Hardy, and another issuing 995 shares to Cash Cole in payment for (1) his lease on the property of the City of Fairbanks which he had made available to plaintiff, (2) “three years of service and negotiating with the F.H.A.” and (3) “more than $10,000.00 in cash expended in promoting the project up until the time of a temporary commitment by F.H.A.”
All of the stockholders and directors had previously signed waivers of notice of meetings to be held on November 2, 1953, but in each waiver the “2” had been stricken and “10” inserted. The record does not indicate when these changes were made or whether they were authorized.
21. By letter of November 16, 1953, to Cash Cole, Hardy and Funk gave notice that they were calling a special meeting of the directors of plaintiff to be held November 17,1953, at Fairbanks. By letter of the same date, attorney Taylor advised them of the special meeting of directors that had been held on November 10, 1953, “pursuant to Waiver of Notice by all directors” and the action taken thereat. Taylor stated that since Hardy and Funk were no longer directors “it is apparent that they have no power to call a special meeting of the directors,” and concluded “Accordingly, no meeting of the directors shall be held at the time or place mentioned in your letter of this date.”
22. Despite Taylor’s letter of November 16, 1953, Funk and Hardy purported to hold a directors’ meeting on November 17. In addition to Funk and Hardy, the three Coles also appeared, but, before the meeting was called to order, and *830 after stating they would not participate in the meeting, departed. Notwithstanding his previous resignation as vice president and director and the purported acceptance of the resignation at the meeting of November 10, 1953, with the ensuing election of Tom Cole as vice president and Taylor to replace him as a director, Funk nevertheless still considered himself as both a director and as vice president, and, in the absence of Cash Cole, president, presided at the meeting. Both he and Hardy believed that the actions taken by the Coles at the purported stockholders’ and directors’ meetings of November 10 were ineffective. Accordingly, he and Hardy proceeded with the meeting, Hardy acting as secretary, and took various actions, including the following: (a) they accepted the resignations of Mrs. Cole and Tom Cole as directors;- (b) Lee Irving and Robert B. Horning, who were officers of Rushlight Automatic Sprinkler Company, were elected directors to fill the two vacancies; (c) created a new office of assistant secretary with authority to perform the same acts as the secretary, and elected Horning to such office; (d) rejected the resignation of Funk as director but accepted his resignation as vice president; (e) elected Irving as vice president; and (f) authorized Irving and Homing to execute a construction contract with Moorland Contractors, as well as all other documents relating to the project, including a promissory note and a mortgage to FHA or FNMA.
23. (a) In early December 1953, it becoming apparent that a settlement of the dispute between the Cole and Rushlight groups would be necessary if construction could be continued in the spring of 1954,-Cole’s attorney, Taylor, by letters of December 11 and 12, 1953, offered to Rushlight’s attorneys a basis for such a settlement involving, among other things, certain modifications in the Cole-Rushlight memorandum agreement (finding 10) as well as an understanding as to the composition of the board of directors and officers.
(b) Shortly thereafter in December, Hardy informed the FHA Office in Portland, Oregon, of the difficulties between the two groups. Hoping to find some solution whereby the loan could be closed prior to February 1,1954, the expiration date of the FNMA mortgage commitment, so that construction could proceed in the spring, he discussed the entire sitúa *831 tion with Harry N. Rockwell, the Portland FHA Office’s “Attorney-Adviser,” who was charged,with responsibility for all legal matters in connection with closing rental housing projects in five Western States and the Territory of Alaska.
24. On January 6,1954, Irving and Homing, purportedly acting as vice president and assistant secretary of plaintiff, executed on behalf of plaintiff, pursuant to the authorizations at the directors’ meeting of November 17, 1953 (finding 22), a promissory note to FNMA in the amount of $2,556,300, and a mortgage to secure the note. Both documents were dated January 6,1954, were on the required FHA forms, and were delivered to FHA and FNMA for approval.
25. Rushlight’s attorneys, by letter of January 15, 1954, made a counterproposal to Cole concerning a settlement. The chief differences between Cole and Rushlight appeared to involve the control of the corporation during the construction period, and ultimate ownership of the corporation. Rushlight was agreeable to Cole’s having complete ownership after completion of construction, but the Rushlight group insisted on control during construction and until the date of the first mortgage payment. The letter closed as follows:
' If Mr. Cole is going to insist upon control of Moorland Court from now until the date of the first mortgage payment, it is our opinion that the project will utterly fail and the Moorland Contractors will, of course, be obliged to file liens, as have some of the other persons mentioned by you. Needless to say, we hate to see that event come about because, in our opinion, it will be practically impossible to reestablish the project or to interest anyone in taking over the existing project.
* * * * ' *
One final thing about which we are deeply concerned is that reports from Washington indicate that there may be very restrictive legislation in the immediate offing on F.N.M.A. projects, and if some kind of an agreement is not made soon so that this loan can be closed we may lose the only source of financing this type of a project.
26. (a) FHA Attorney-Adviser Rockwell became concerned about the entire problem and, on January 27, 1954, made a detailed report thereof to his superior in Washing *832 ton, D.C., Edward H. Coulter, Chief Counsel of FHA’s Multifamily Housing Division. Although '.Rockwell doubted the legality of the November 10,1953, meeting and the validity of the action taken thereat in canceling the stock certifi<cate to Bushlight Automatic Sprinkler Company, he nevertheless felt the action could not be “ignored” and that the loan should not be closed unless the two groups settled their •differences. As matters then stood, there were two different sets of resolutions authorizing the execution of the loan documents by different officers. He reported that the title company, with full knowledge of the situation, was nevertheless ■willing to issue a title insurance policy, thus in effect insuring the validity of the organization of the corporation and of the authorization of the mortgage documents. However, Be felt that FHA had, as the holder of plaintiff’s preferred .■stock, an independent obligation to satisfy itself as to such ■validity and concluded that FHA, “rather than deciding at its peril the faction to be recognized, should require an adjustment of the differences between the groups” and that “It is my considered opinion that if both groups fully under-stand that their differences must be settled prior to closing, .-such differences will be settled.”
(b) By letter of January 29,1954, Coulter advised Bock-•well that he was in agreement with Bockwell’s analysis of the ¡situation. His letter further stated:
The feud here is between or among the sponsors, stockholders and officers. Until such time as they can adjust their questions and elect a board of directors that you are satisfied constitutes a legal board, we cannot afford to proceed with the assumption of liability by endorsing the note in this case for insurance. The fact that there is a deadline fixed by one of the mortgagees is not a consideration in connection with the proceedings.
(c) These positions of Bockwell and Coulter were reasonable.
27. (a) Normally, when FHA granted permission to commence construction prior to the loan closing, such closing took place very shortly after construction, and Bockwell was .anxious to effect as speedy a loan closing as possible. By letter of February 5, 1954 to plaintiff, Bockwell explained ■.the various steps plaintiff would have to take and the docu- *833 merits that would have to be submitted in connection with such closing, and further stated:
Since construction of this project was undertaken several months ago, I anticipate an early closing date,, preferably the latter part of this month.
(b) By letter of February 19, 1954, the Assistant Commissioner of FHA in Washington, D.C., Clyde L. Powell,, gave certain instructions to Rockwell concerning the contemplated closing and stated:
The matter of procedure to be followed must be left to you; but I do agree that every effort should be made to bring this situation to a conclusion without delay.
28. (a) On February 23, 1954, G. R. Sumpter, an official of the Washington Mortgage & Insurance Company, with the purpose of effecting as early a closing as possible, came-to Washington, D.C., and conferred with Coulter and others. He informed that the Rushlight group had now prepared, closing papers executed in accordance with the action of the board of directors at the November 17,1954, meeting and. requested an initial closing (i.e., an actual endorsement of plaintiff’s note for insurance in accordance with the FHA commitment). To assure- FHA, Sumpter stated that there-would be presented a title insurance policy, and a 100 percent surety bond guaranteeing completion of construction. After a review of the entire situation, however, Coulter took the position that, in view of the fact that plaintiff’s articles of incorporation provided for a board of three directors but that initially a board of five was elected, and in view of the-conflicting actions of the Cole and Rushlight groups at the-purported board meetings of November 10-and 17, 1953, at which the Cole interests had established a different board’ and the Rushlight interests had established a still different-board, with each board electing a different slate of officers, it: was not clear that there was then a legally constituted board' of directors authorized to act for plaintiff nor was it clear who were the legally constituted officers duly authorized to-execute the loan documents. He concluded, therefore, that FHA should not, despite the title insurance policy and the-100 percent surety bond, proceed with the initial closing until *834 plaintiff’s family feud was settled and an unquestionably valid corporate note, duly authorized and executed by proper officials, was presented.
(b) By letter of February 25, 1954, Coulter so reported to Rockwell, and advised that Assistant Commissioner Powell agreed with him. He further stated, however, that the entire matter was then pending before the FHA’s General Counsel “for his review and final advice.”
(c) Shortly thereafter the General Counsel agreed with Coulter’s position, and Rockwell was so advised.
(d) All the above FHA decisions were reasonable.
29. (a) During February 1954, Moorland Contractors filed a lien against plaintiff. Thereafter, in March 1954, plaintiff, acting through Cash Cole, as president, and by attorney Taylor, sued the three firms comprising Moorland Contractors alleging that the filing of the lien was a wrongful act detrimental to plaintiff.
(b) There had also been filed against plaintiff in January and February 1954, by three other companies, liens for material furnished, equipment rented, and work performed.
30. In an attempt to arrange plaintiff’s corporate affairs so as to satisfy FHA with the validity of plaintiff’s note and mortgage, the Rushlight group decided to hold another stockholders’ and directors’ meeting and to take action thereat which would serve to clear up all questions of doubtful legality. To this end, Lee Irving, president of Rushlight Automatic Sprinkler Company, on behalf of said company as the purported owner of 996 common shares of stock (constituting more than 50 percent of the outstanding common stock), caused to be served upon the three Coles and Hardy, being all the other stockholders of record, a notice dated March 1,1954, of a special meeting of stockholders to be held in Fairbanks, Alaska, on April 2,1954, for the purpose of removing, for cause, the three Coles as directors, electing directors in their stead, and transacting such other business as might come before the meeting.
31. (a) Presumably in an attempt to hasten a settlement between the Cole and Rushlight groups so that the initial closing could be effected promptly and prior to the approaching construction season, Rockwell, by letter of March 4,1954, *835 to the FNMA Office in Los Angeles, California (which office was handling the details of FNMA’s relationship to the project) , copies of which went to all other interested persons and parties, including the entire Cole and Rushlight boards of directors, called a meeting of all such persons and parties to be held on March 16,1954, at the FHA Office in Seattle, Washington. The letter read as follows:
Several months have elapsed since construction of the captioned project was undertaken last August and initial closing has not, as yet, been accomplished. The construction season in the Fairbanks, Alaska area is fast approaching and it therefore appears to me that further delay in submitting all closing papers, which are a prerequisite to initial endorsement of the credit instrument, is not warranted.
I am not unmindful of the fact that your office is located in Los Angeles, California, some of the parties are in Fairbanks, Alaska, and others are in Seattle, Washington and Portland, Oregon. I therefore feel that initial closing of this project should take place in Seattle, Washington.
This is to advise you that I will be at the office of the Federal Housing Administration, * * * Seattle, Washington, at 9:00 A.M. on March 16,1954, for the purpose of accomplishing the initial closing * * *. I shall expect a repi-esentative of your office to be present at that time.
I am directing copies of this letter to all persons who are, or claim to be, stockholders, directors, or officers of Moorland Court, Inc. I shall expect such persons to be present.
Arrangements should be made for representatives of the title company, bonding company, general contractor, and architect to be present at the appointed place and time.
(b) By letter of March 6,1954, the Coles’ attorney, Taylor advised Rockwell that in his opinion the meeting should be held in Fairbanks where the project was located and stated, among other things, that it would “work an undue hardship upon the stockholders, directors and officers of Moorland Court, Inc. to all come to Seattle for a meeting, as we do not know what can be accomplished at that meeting.” He further stated that the Cole group was attempting to supplant Rushlight with another construction contractor and pay *836 Rushlight the amount he had expended in preliminary construction and that, if they had “something definite to work on, we will have a representative present at your meeting on Maroh 16,1954.”
(c) By letter of March 13,1954, the Coles’ other attorney, Bell, similarly advised Rockwell, among other things, that in his opinion the meeting should be held in Alaska since “All of the Board of Directors honestly interested in Moorland Court, Inc., live in Alaska and all of them reside in Fairbanks except me.”
32. On March 16,1954, the Seattle meeting called by Rockwell was held and attended by representatives of FNMA (Abner J. Swanson, Los Angeles Agency Counsel), FHA (Rockwell), the construction contractor, the title company, the bonding company, and the Washington Mortgage & Insurance Company, as well as by the architect and all of the persons purporting to be shareholders or directors of the plaintiff, with the exception of. the three Coles and their two attorneys. Although the title insurance company stated it was prepared to issue the title policy without the agreement of the Cole group, both Rockwell and Swanson, the latter not previously having been fully informed of the facts, stated that, they did not feel that FHA or FNMA could proceed any further with the loan closing at this time without a resolution of the differences between the Cole and Rushlight groups and a proper corporate record presented.
33. On March 27,1954, Irving served upon the three Coles' a “specification” of causes for their removal as directors off plaintiff by reason of their “gross misconduct, abuse of trust,, malfeasance and actions destructive of the corporation’s policies, purposes and solvency.” Listed were their holding of the special directors’ meeting of November 10,1953 “without the notice or knowledge of, presence at, or waiver of notice-by, all of the Directors of said corporation”; their action at such meeting in electing non-stockholders Taylor and Bell' as directors despite the bylaw provision that directors must be stockholders; their attempt at such meeting to cancel the 996-share stock certificate to Rushlight Automatic Sprinkler Company for alleged failure to pay the subscription price-despite the $4,980 company check paid therefor; their attempt *837 at such meeting to cancel the stock certificate for one share issued to Hardy for alleged failure to pay the subscription price although such payment was, to their knowledge, in fact made; their attempt at such meeting to remove Hardy as a director because he was no longer a stockholder when to their knowledge he was a stockholder; and their failure to attend the March 16, 1954, meeting called by FHA for the purpose of closing the loan.
34. (a) On March 30,1954, Rockwell executed an affidavit (presumably for use at the forthcoming special stockholders’ meeting of April 2, 1954) concerning the meeting of March 16, 1954, which he had called. In this affidavit he stated, among other things, that “The initial closing of the loan necessary for the financing of the project * * * was not accomplished owing to the fact that 'Cash Cole, Ruth M. Cole, Tom Cole, Bailey E. Bell and Warren A. Taylor, who claimed an interest in the project as stockholders, directors and/or officers of Moorland Court, Inc., did not make their appearance in person or by proxy.”
(b) Since Rockwell, and his superiors Coulter and the FHA General Counsel had all, prior to the meeting, concluded that the loan should not be closed unless the Cole and Rushlight groups settled their differences and were able to present a corporate record of unquestioned validity, and since both Rockwell and Swanson expressly so stated at the March 16, 1954 meeting, it is clear that, even had the Cole interests appeared at the meeting the loan would still not have been closed thereat had the two groups not been able to compose their differences prior to or at the meeting. Therefore, the statement made in the affidavit was not wholly accurate.
35. (a) On April 2, 1954, a purported special meeting of the stockholders was held in accordance with the notice of March 1,1954, and the specification of charges of March 27, 1954. Attending were Hardy, as the purported owner of one share, and Lee Irving, president of and representing Rush-light Automatic Sprinkler Company, the purported owner of 996 shares. In the absence of the president of the corporation (Cash Cole) and the secretary (Mrs. Cole), Irving acted as chairman and Hardy as secretary.
*838 It was stated at the meeting that one reason for removing the Coles as directors was for cause, as stated in the specifications, and another being that their election at the first meeting of stockholders might have been invalid because the articles called for only three directors whereas the stockholders, under the bylaws, had elected five (the three Coles, Funk and Hardy), and “Government attorneys had questioned whether or not the stockholders had ever elected a valid board of directors under the circumstances.”
In support of the removal for cause, the following documents were incorporated in the minutes of the meeting: (a) Taylor’s letter of November 16, 1963 (finding 21); (b) the Rushlight Company’s check for $4,980, endorsed by Cole as president of plaintiff; (c) the company’s common stock certificate for 996 shares; and (d) the Rockwell affidavit (finding 34(a)).
Hardy stated at the meeting that he had never executed any waiver of notice for a directors’ or stockholders’ meeting on November 10,1953, nor had he or the Rushlight Company ever received any notice of such meetings; that the purported election of Bell and Taylor as directors was in violation of the bylaw provision requiring directors to be stockholders; that the attempted cancellation of the Rushlight Company’s stock certificate was ineffective because (a) the subscription price had in fact been paid therefor, as the company’s endorsed check showed (and plaintiff’s first year’s rental to the City of Fairbanks under its lease was paid out of the proceeds of such stock subscription), and (b) in any event, the statutory procedure for cancellation of corporation stock was not followed with respect to the notice requirements; that Hardy had personally delivered to Cash Cole payment for his one share of stock, which payment was deposited in plaintiff’s bank account, and therefore the cancellation of Hardy’s stock certificate for alleged nonpayment of the subscription price, and the removal of Hardy as a director because he was no longer a stockholder, were ineffective; that plaintiff’s only asset was the lease from the City of Fairbanks, the purpose of which, however, was limited to an FHA housing project; that mortgage commitments had been made “which have been extended from month to month, but there is no assur- *839 anee how long those extensions may be given”; that before Government funds could be obtained “some thirty sets of documents required for closing” would have to be executed and the Coles had frustrated such execution and made it impossible to close the loan by failing to appear at the meeting called by Rockwell, as set forth in the Rockwell affidavit; and that “unless said loan is closed in the immediate future, the corporation will lose its lease and its right to an F.H.A. loan and said corporation will be bankrupt, and failure of these directors to do necessary acts on behalf of the corporation is resulting in its being seriously endangered, to the detriment of the holders of all common stocks.”
Resolutions were then adopted stating that, on the basis of the “documentary and oral evidence produced at this duly called meeting of the stockholders,” the charges were substantiated and the Coles were “removed for cause as directors of Moorland Court, Inc., said removal to take effect immediately.” The bylaws were then amended to conform to the articles so as to provide for a board of only three directors, and such a board, consisting of Irving, Hardy and Ralph J. Rivers, Mayor of Fairbanks, was then elected.
Since the bylaws required the officers to be selected from the directors, and since Cash Cole, the president, and Mrs. Cole, the secretary, were no longer directors, they were then removed as such officers.
There then were adopted various resolutions ratifying previous corporate, board, and officers’ actions, including the issuance of stock certificates to Cash Cole (1 share), his wife (1 share), his son (1 share), Hardy (1 share), and Rush-light Automatic Sprinkler Company (996 shares); the authorizations (at the board meeting of September 1,1953) to enter into a lease with the City of Fairbanks and a construction contract with Moorland Contractors, Inc:; the various actions taken at the board meeting of November 17, 1953; and the execution by Irving and Homing of the note and mortgage of January 6,1954.
A further resolution was also adopted to the effect that, since “extreme urgency is necessary in order to do everything possible to expedite the closing of the loan with FHA and getting construction under way once more,” the new board *840 and officers were urged to take all actions necessary to expedite the closing, and if, in such connection, the execution ■of a new note and mortgage were necessary, the execution thereof was authorized.
(b) On the same day, Rushlight Automatic Sprinkler ’Company sold to A. G. Rushlight & Company and to Ralph-J. Rivers 10 shares and 1 share, respectively, of the 996 shares it allegedly owned, thereby leaving it with 985 such shares.
(c) Thereafter, and still on the same day, Irving, Hardy and Rivers purported to hold a board of directors’ meeting at which the following action, among others, were taken: the offices of president, vice president, secretary and treasurer were declared to be vacant because of the alleged action of the stockholders in having removed the Coles as directors and their having elected an entirely new board; Irving, Rivers, Hardy and Homing were purportedly elected to the offices of president, vice president, secretary, and assistant •secretary-treasurer, respectively; confirmed and ratified the same previous acts as the stockholders, including the execution of plaintiff’s note and other documents; and authorized the president and secretary to execute all further documents required by FHA and FNMA to close the loan and to effect the construction of the project.
36. (a) The following day, April 3, 1954, Hardy forwarded to FHA in Washington, with a copy to Rockwell, ■certified copies of the stockholders’ and directors’ proceedings of April 2,1954, together with a supporting legal memorandum concerning the validity of the actions taken thereat.
(b) By letter of April 9,1954, to Coulter, Rockwell, concluding that the actions taken at the meeting of April 2,1954, •sufficiently cleared up the corporate record, recommended that action now be taken by FHA to close the loan. He felt, among other things, that the failure of the Coles to attend the March 16,1954 Seattle meeting which he had called (as well as their failure to attend the April 2, 1954 stockholders’ meeting and to defend themselves against the charges) served to defeat the very purpose for which plaintiff was organized and was, therefore, sufficient justification for their removal as directors; that in any event the election of *841 an entire new board of three cleared up the doubt cast upon the validity of the previous board of five; and that, in view of the $4,980 check given for the stock as well as the requirements of the Alaska Statutes as to the procedure to be followed in canceling stock certificates for failure to pay the subscription price (i.e., a 60-day notice), which procedure was not shown to have been followed, there was no reasonable basis for concluding that the cancellation by the Coles of the Rushlight Automatic Sprinkler Company’s 996-share stock certificate was valid. Rockwell therefore recommended that a closing date again be set, with all the stockholders, including the Coles, to receive another notification and that if the Coles again failed to attend and show good cause why the case should not be closed, it should be considered that they “ratified by acquiescence” so that FHA. would then be safe in proceeding to close. He noted, however, that the lien filed by Moorland Contractors against the project (finding 29(a)) would have to be released as a prerequisite to closing.
(c) By letter of April 12, 1954, Coulter advised Rockwell that he (as well as FHA’s General Counsel) was in agreement with the views expressed in Rockwell’s letter and, although “it is most likely that the recalcitrant stockholders may try to cause trouble,” authorized Rockwell to proceed with the closing provided, however, FHA was in “receipt of a satisfactory title policy, with a recital therein, or in a letter from the title insurer, to the effect that it is familiar with the prior proceedings.”
(d) By letter of April 16,1954, to FNMA Agency Counsel Swanson, Rockwell advised that in view of Coulter’s authorization, Rockwell now saw “no reason why we should not proceed to closing and initial endorsing of the instrument * * He also so advised Hardy.
37. (a) By letters of April 20 and 21,1954, the Washington Mortgage & Insurance Company submitted to FNMA Los Angeles Agency Counsel Swanson numerous papers in anticipation of the closing, including the note and mortgage, and on the latter date, Hardy conferred with Swanson.
(b) On April 21, 1954, the mortgage dated January 6, 1954 (finding 24), was recorded.
38. On April 22,1954, Hardy conferred over the telephone *842 with. Paul Akin, FNMA’s Los Angeles Agency Manager, during which he urged expedition in order that the short Alaska construction season could be taken advantage of and stated that the title insurance company would, with full knowledge of all the facts, issue its policy.
39. After his independent review of the entire matter, FNMA Los Angeles Agency Counsel Swanson was not satisfied that the case was ready for closing. In a lengthy memorandum dated April 29, 1954, to Robert N. Reid, FNMA’s Vice President and General Counsel in Washington, D.C., he stated that in his opinion there had not “been a proper resolution of the differences or determination of the matter removing doubts as to who are qualified as directors, officers, and stockholders” and that neither FHA nor FNMA would be justified in closing the loan and disbursing loan funds “until such time as all differences between the clashing factions are settled and harmony again prevails * *
He felt that without an amicable settlement, the only solution would be by way of litigation to resolve the dispute or appropriate action to be taken at the next regular annual meeting of stockholders in August, as provided by the bylaws. He stated that while the Rushlight group was understandably anxious to complete construction and protect the investment it already had in the project, nevertheless FNMA was not responsible for the clash between the two groups and was entitled “to have a properly constituted-mortgagor execute the mortgage and the related note.” He disagreed with Rockwell’s and Coulter’s conclusion that the failure of the Coles to appear at the projected closing would preclude them from questioning its legality, and stated that, as agency counsel, he could not, in view of the purported directors’ meeting of November 10, 1953, give the required legal opinion approving the note and mortgage executed subsequent thereto on January 6,1954.
40. By letters of April 29, 1954, FHA Attorney-Adviser Rockwell advised the three Coles that he proposed to undertake the initial closing on May 6,1954.
41. By memorandum dated May 3, 1954, to Reid, FNMA Los Angeles Agency Manager Akin referred to Swanson’s recommendation of April 29, 1954, and raised the question *843 •wb.etb.er FNMA should close the loan prior to the construction season without an Agency Counsel’s legal opinion. He expressed “concern * * * over the possibility that FNMA is being jockeyed into a position where it is the sole opposition to loan closing prior to the current construction season” since FE.A was ready to close and it appeared that the title in-su: anee company, with full knowledge of “the possible ir-reg ularities” in the corporate proceedings, was nevertheless rea'dy to issue a policy. Akin concluded:
Although ! am no more anxious than anyone else to commence disbursements on a loan we might conceivably have to turn over to FHA even before completion, I must admit that we face such possibility to some degree on any large scale housing loan. However, if the above position of FHA and the title company is considered material and can be verified, this may well be a situation where FNMA would wish to permit an exception in counsel’s required legal opinion and authorize closing of the loan nevertheless.
42. (a) By letter of May 4, 1954, Swanson furnished to Bockwell a copy of Swanson’s April 29,1954, memorandum toBeid.
(b) By letter of the same date, the Coles’ attorney Taylor, in response to previous communications from Bockwell, forwarded to Bockwell certified copies of the stockholders’ and directors’ meetings of November 10, 1953, together with signed copies of waivers of notice of the meetings. He also' explained the Coles’ position in not attending the previous loan closing meeting called by Bockwell at Seattle, stating, among other things, that since the Coles felt they were the only directors and they all resided in Alaska, and considering the large travel expense involved, the closing should take place in Alaska, where FHA also had a Director’s Office. Further, since Bushlight and others were claiming interests in the project which the Coles believed they did not have, “it was felt that no satisfactory results would come from the said meeting.” He also stated that the Bushlight stock had not been paid for because a good part of it went to pay for rent under the lease which the Bushlight group itself was supposed to pay, and “that would certainly not be paying for 996 shares of stock,” but that nevertheless the
*844 Coles tad offered the Rushlight group a settlement based on the original Cole-Rushlight agreement (finding 10). He closed by stating:
We are in a position to keep this matter in litigation for quite sometime, so that nobody will do any work on this property, and unless there is some justice dotte in this matter, that is just exactly what will happen. ■_
We have attempted to be fair in this matter, but-it seems as though those on the other side are, to a certain extent, not familiar with the word “fair” or its meaning.
43. On May 6, 1954, Moorland Contractors, as principal, and United States Fidelity and Guaranty Company, as surety, executed a “Dual-Obligee-Contract Bond” running in favor of FNMA., or its successors and assigns, and the plaintiff, in the sum of $2,535,801, being the full contract price for the construction of the housing project, pursuant to the construction contract of September 2, 1953, between plaintiff and Moorland Contractors.
44. (a). In view of Taylor’s letter of May 4, 1954, Rockwell again reviewed the situation but still concluded that FTTA should proceed with the closing, and in a letter dated May 7, 1954, so advised Coulter. Rockwell stated he was “not favorably impressed” with Taylor’s letter, and rejected the validity of the action taken by the Coles on November 10, 1953, noting the unexplained change from “2” to “10” on the waivers of notice (finding 20) (and a similar change on the Funk resignation), as well as the failure, in his opinion, to follow the Alaska statutory provisions relating to cancellation of stock certificates. He felt also that the attempt at the directors’ meeting to issue 995 shares to Cash Cole (finding 20) was ineffective because such stock was not available to be issued (the cancellation of the Rushlight stock certificate being ineffective).
(b) By letter of May 11, 1954, Coulter agreed with Rockwell and authorized him to effect the closing, provided however, that FNMA agreed, that a satisfactory title insurance policy was submitted, and that all other closing requirements were met.
45. (a) Upon further inquiry by Washington, D.C. FNMA officials of FNMA Agency Counsel Swanson as to the specific reasons why he felt the meetings of April 2,1954, *845 were an insufficient basis upon which to predicate a closing, Swanson, by a lengthy memorandum dated May 11, 1954, to FNMA General Counsel Eeid, again recommended that FNMA refrain from then effecting a closing. He felt, among other things, that there was sufficient doubt as to the validity of the note and mortgage executed by and pursuant to the authority of the Eushlight interests as to warrant FNMA’s refusal to proceed; that the facts, many of which were being obtained in piecemeal fashion, were still unclear and unknown and there was too much dispute as to the truth, making it impossible for the agency to determine with certainty as to whether the action taken by the Cole group at the November 10, 1958, meeting was valid or invalid; that the waivers for the meetings which were concededly executed might well have been valid as the Coles’ attorney was insisting, despite the date change and that, in any event, in the absence of contrary proof, corporate meetings under the law are presumed to have been regularly called; that the bylaws provided for the calling of special meetings by the president and any two directors, so that Cash Cole (president and director) and his son Tom (director) could have validly called the meetings anyway; that if there was a valid waiver of the statutory notice, the cancellation of the Eushlight stock certificate may well have been effective provided the $4,980 check was not to be considered, as the Coles insisted, as payment for the shares; that if there was such a valid cancellation and validly held November 10, 1953 meetings, all the subsequent events and meetings relied on by the Eushlight group and FHA were nullities, for after November 10,1953, the Coles would be the only stockholders and nothing could now be done without their consent; that absent a voluntary agreement by the two groups to compose their differences, the only safe course to follow would be for the issues to be submitted to a court determination, based upon all the true facts, which could, he felt, only be ascertained as an incident to a judicial proceeding as to who, under all the circumstances, could validly execute the note and mortgage; that the Eushlight group itself must have had some doubts as to the effectiveness of their acceptance, at the November 17, 1953 meetings, of the resignations of the Coles group as directors (indi- *846 eating the possibility of a prior withdrawal of such resignations) because of their subsequent action at the April 2,1954 meetings of removing them all over again; that FNMA would almost certainly be letting itself in for litigation for no matter which group it lent the money to, the other group would in all probability object and litigate and in the process thereof might upset the validity of the note and mortgage; that, while ordinarily much reliance is placed upon title insurance where there is nothing in the files inconsistent therewith, nevertheless where, as here, the record gives rise to doubts as to the validity of the loan documents, “we must resolve these doubts independently of the policy of title insurance,” and “Here we cannot do that.” Swanson concluded :
* * * The efforts of the parties to provide FNMA with material as an aid in resolving doubt and reaching a decision has so far failed. The two factions remain at odds with each other. The validity of the mortgage and mortgage note remains in doubt. The identity of the majority stockholders is not known for certain. The identity of the corporate directors and officers is likewise not known. The record as to liens filed against the leasehold is not before us. We have threats of litigation. There have been veiled hints of illegal diversion of materials from another housing project by parties involved herein. This hodgepodge of claims, disputes, charges and counter-charges, threats and accusations does not present an attractive field for the investment of FNMA funds. Accordingly, I recommend against disbursement at this time and further recommend that we take positive action to advise all concerned that FNMA will disburse no funds for the reason that the proposed mortgagor has not presented such instruments, documents, and evidence as FNMA deems necessary to protect the interests of the Association. Until the disputes between the parties have been settled and acceptable evidence thereof submitted to FNMA, either in the form of an agreement between the parties or a decree of court, FNMA should refuse to become further involved.
(b) Swanson’s position was reasonable.
46. By letter of May 14, 1954, Swanson was advised by FHA Attorney-Adviser Rockwell that there had been delivered to FHA a title insurance policy assuming a liability of $2,556,300. However, because of this large amount FHA *847 was requiring eo-insurance. Rockwell also advised that there had been issued to the FHA the 100 shares of preferred stock in the plaintiff required by the FHA and FNMA loan commitments. The title policy insured FNMA and/or FHA with respect to the mortgage of plaintiff dated January 6, 1954, and recorded on April 24,1954, being a first mortgage on the leasehold interest of plaintiff, all as was required by the FHA loan commitment and the FNMA loan authorization. FNMA, after first raising a question concerning this policy, was furnished supplemental documents which satisfied it that the policy would meet its requirements relating to such a document.
47. On June 4, 1954, a conference was held at FNMA’s Los Angeles Office between Sumpter and Hardy, purportedly representing plaintiff, and representatives of FNMA, including Swanson and Agency Manager Akin. As a result thereof, Akin became convinced that FNMA should close the loan with the Rushlight interests representing plaintiff. By memorandum of June 4, 1954, to FNMA’s Loan Manager (Tyler) in Washington, D.C., Akin so indicated. He stated that, on the basis of the information furnished by Sumpter and Hardy, Rushlight was a successful contractor with good credit standing but that Cash Cole, who “has acquired a reputation as a troublemaker,” was essentially a promoter with limited financial worth; that Akin believed that the Cole interests “are using as a bludgeon the investment of something over $800,000 that the Rushlight interests have now made in site improvements”; that Cash Cole’s “present play, so far as I can understand it, seems to be to acquire complete control of the project”; and that in his opinion plaintiff would have no difficulty in complying with the requirements of FNMA’s commitment letter of August 28, 1953. He further advised that Agency Counsel Swanson still felt he could not render Ms opinion approving the closing of the loan short of a voluntary settlement between the Ruslilight and Cole groups, or, in the alternative, the rendition of a final court decision; that the matter therefore presented a case wMch could only be decided at the Washings ton level, namely, whether FNMA could rely upon a title policy, plus a 100 percent completion bond from United *848 States Fidelity & Guaranty Company, plus the right to transfer the loan to the FHA in the case of default prior to completion, or recover from the title companies if FNMA could not convey due to defective title. He stated that,' in the event a transfer was made to FHA, the transaction would not result in a loss to FNMA since the fees collected would more than cover the discount on such transfer. Akin concluded as follows:
In view of the above factors, and considering our insulation from loss by the FHA, the title companies, and the bonding company, who are prepared to go ahead in the face of infinitely greater risks than we assume, I remain of the opinion expressed in my memorandum of May 8, 1954, that this may well be a situation where FNMA should permit appropriate exception in Counsel’s required legal opinion and authorize closing of the loan.
48. On June 16,1954, the three Coles and Bushlight Automatic Sprinkler Company entered into an agreement, copies of which were sent to FHA and FNMA, in which they agreed that “the negotiations now pending for a mortgage loan * * * may be continued and closed”,* that the Coles agreed that the note and mortgage of January 6,1954, “are valid and existing obligations” of the plaintiff and that they would not “challenge by any action in court, or 'by any other means whatsoever, the validity of the mortgage note and mortgage” or any other documents executed in connection therewith “or the disbursement of the proceeds thereof, or the continued existence and validity thereof * * The parties, however, reserved the right, as between themselves, by litigation or otherwise, 'to assert adverse claims to the ownership of the common stock of plaintiff.
49- (a) By telegram of June IT, 1954, Hardy advised HHFA in Washington, D.C., of the Coles-Rushlight settlement agreement and requested that “instructions be given for the immediate closing of the loan so that steps may be immediately taken for a resumption of construction.”
(b) By telegram of June 18,1954, HHFA Administrator Cole advised Hardy that FNMA was “willing to consider proceeding with loan upon” certain conditions, including the execution of a satisfactory “supplementary agreement” by *849 all the corporations and individuals controlled by tbe Cole and Rushlight interests as well as 'by all individuals who claimed to be stockholders, officers, or directors, whereby all signatories would (1) agree to forgo all suits or other action that would interfere with the construction of the project or would contest the validity of the lease, note, or mortgage, or would affect income required ‘for debt service and operating expenses, and (2) agree to the fulfillment of all other conditions incident to the original FNMA loan authorization “subject to confirmation in additional detail by FNMA Agency Counsel at Los Angeles.”
(c) By letter of June 19,1954, Hardy sent to FNMA Los Angeles Agency Counsel Swanson a proposed form of supplementary agreement in attempted satisfaction of the HHFA Administrator’s requirements.
(d) By letter of June 24, 1954, to the Coles’ attorney Taylor, Swanson, evidently not satisfied with the Hardy draft, forwarded for execution by the three Coles, Taylor, Rivers and Bell, and thereafter for forwarding to Hardy •for execution by all the other parties, a supplementary agreement which Swanson himself had drafted and which was designed to “eliminate all matters and questions in dispute between the parties except the ownership of the capital stock of Moorland Court, Inc.” The letter further stated:
It should be clearly imderstood by all parties to the agreement that the Federal National Mortgage Association will give further consideration to proceeding with the loan only if the supplementary agreement is entered into by all the parties thereto, and with the further proviso that all other conditions of the loan authorization issued by this Association on August 28, 1958, are fulfilled, except that the determination of the ownership of the common stock of Moorland Court, Inc. may be reserved as provided in the supplementary agreement.
*****
In no sense should the aforesaid [Cole] telegram, the supplementary agreement, or this letter be construed by anyone to constitute a commitment, promise or agreement by the Federal National Mortgage Association to make the loan requested by Moorland Court, Inc. The loan will be made by this Association and an initial disbursement of loan funds made only upon full compliance *850 with all of tbe conditions which apply * * *.
Similar statements were contained in a letter of the same date sent to Hardy.
50. On July 6,1954, Swanson, not having heard from the attorneys for the Cole and Kushlight groups concerning the execution of the supplementary agreement which he had prepared, in an attempt to expedite the proceedings should the agreement be executed and should FNMA “decide to make the loan,” sent a lengthy letter to Hardy:
* * * to advise you now as to the various matters discussed by us at our last conference * * * in connection with the conditions of the loan authorization dated Au-gist 28, 1953, and to amplify some of those conditions. ertain additional steps will be necessary to bring Moorland Court, Inc., more closely into compliance with the conditions of the loan authorization. * * *
Swanson detailed each requirement and document which plaintiff would have to submit, as well as certain corrections which would be required with respect to documents already submitted. Among other things, he pointed out that the note already executed was signed by the vice president only, and simply “attested” by the assistant secretary, whereas the assistant secretary was, under the resolutions adopted, also required to join in the actual execution; that there was a discrepancy between the legal descriptions in the basic lease and in the FHA Commitment for Insurance which FNMA would waive provided FHA did not object; and that the validity of plaintiff’s underlying lease between plaintiff and the City of Fairbanks be established and supported by an opinion of the City Attorney, since the enacted City Ordinance authorizing the lease provided that it was to be entered into with “Cash Cole or his assignees” and there had not been presented any evidence of any assignment from Cole to plaintiff. The letter closed as follows:
As I previously advised you, in no sense should this or any other prior communication to you or the other interested parties be construed to constitute a commitment, promise or agreement 'by the Federal National Mortgage Association to make the mortgage loan requested by Moorland Court, Inc. While it is true that upon specific authority from our Washington, H.C. officials we have *851 been permitted to withdraw, as a condition precedent, our requirement that the disputes as to the ownership of common stock be acceptably settled, this in no way varies the other requirements imposed by virtue of the statutes and regulations governing FNMA’s activities in connection with the making of direct loans to be secured by properties situated in the Territory of Alaska.
I trust that the foregoing will be helpful to you in your efforts to obtain the concurrence of the parties in the execution of the Supplementary Agreement and furnishing the supporting material required of you.
51. By memorandum of July 23, 1954, the Acting Commissioner of FHA notified the Directors of all FHA Field Offices that it seemed likely that the pending Housing Act of 1954, which made important and extensive changes in the National Housing Act, would be enacted and approved in the near future; that all Field Directors would be notified by telegram immediately upon the President’s signing of the Act, and that:
After receipt of the telegram no commitment will be issued, reissued, • extended, increased or otherwise amended until receipt of the amended Bules and Begu-lations and necessary forms and instructions from this office.
The memorandum went on to state, however, that the policy would be to permit amendments enabling participants in the program “to obtain the benefits of the new legislation, provided, of course, that any amended or extended commitment must contain provisions which will make effective the new restrictions and limitations.” It also stated that:
It should be clear, of course, that existing commitments which are not reissued, extended, increased or otherwise amended represent firm contractual obligations of the Administration and will not be affected by the new legislation.
52. (a) As forecast by the FHA memorandum of July 23,1954, the National Housing Act, as amended, was further amended by the National Housing Act of 1954, effective August 2, 1954. The amending legislation imposed additional requirements upon corporate mortgagors seeking insurance under Title 207 and prohibited further loans by FNMA on such housing projects as was herein involved, unless such *852 loans were made on commitments which were outstanding prior to August 2,1954. However, under the National Housing Act of 1954 and the rules and regulations of FHA promulgated thereunder, FHA was authorized to grant extensions and renewals of pre-August 2,1954 commitments for insurance. The only source of financing the housing project here involved was a direct FHA insured loan from FNMA.
(b) On and after August 2,1954, FNMA 'became and has remained a completely reconstituted and rechartered corporate entity under the Federal National Mortgage Association Charter Act (68 Stat. 612-622). Prior to August 2, 1954, FNMA operated with appropriated funds. However, since that time, FNMA has operated primarily with non-appropriated funds obtained from 'borrowings from the public on debentures which state on their face that they are not obligations of the United States, despite the ownership of 50 percent of the corporation’s stock by the United States.
53. (a) By August 5, 1954, the supplementary agreement drafted by Swanson and forwarded to Taylor for execution on June 24,1954, still remained unexecuted, and on that day Hardy sent a letter to Swanson advising that Taylor wanted certain changes in the agreement. Hardy expressed the hope that the agreement, as amended by Taylor, would be in Swanson’s hands “in the very near future.”
(b) On the same day, Taylor sent a letter to Swanson suggesting certain changes which would qualify and limit a provision in the agreement whereby the parties indemnified FNMA and FHA.
(c) By letters of August 18, 1954, to Taylor and Hardy, Swanson forwarded a redraft of the supplementary agreement in an attempt to incorporate the changes desired 'by Taylor.
54. On August 30, 1954, a purported annual meeting of plaintiff’s stockholders was held dominated' by the Rush-light interests at which Irving, Rivers, and Hardy were elected directors, and the execution of the previous note and mortgage was ratified. The directors thereupon elected Irving as president; Rivers, vice president; Hardy, secretary; and Homing, assistant secretary and treasurer. Cole’s *853 previous authority to withdraw funds from plaintiff’s bank account was rescinded.
55» (a) By September 21,1954, the supplementary agreement between the Cole and Eushlight interests still had not been executed. Cole and Eushlight were attempting to work out an agreement whereby Cole would have an option to purchase Eushlight’s stock upon completion of construction of the project, but were unable to arrive upon mutually satisfactory terms. Cole was contending that it was his and Eushlight’s understanding and agreement from the very beginning that the Eushlight 996 shares were to be put in Eushlight’s name only during the construction period for the purpose of aiding Eushlight to obtain financing and only so long as Eushlight would proceed with construction, and that upon completion of construction,, the stock would, be reassigned to Cole for a nominal consideration. In the mean-time, Cole closed out plaintiff’s bank account, and the Eush-light interests were demanding an accounting. Cole claimed he had used the funds to pay the second year’s rent, on plaintiff’s lease with the City of Fairbanks, an obligation which, he contended was, under the original Cole-Eushlight understanding, to be that of Moorland Contractors, and not plaintiff’s.
(b) On the same date, the FNMA. Field Office in Los Angeles sent a letter to the FHA Director at Juneau, Alaska, stating that the FHA Commitment for Insurance, as extended, would expire on October 1,1954, and that “As it will not be possible to complete the closing by that date, we shall appreciate your granting a further extension to November 1,195A”
(c) However, by letter of September'24,1954, said FHA Director advised FNMA that no further extensions could be given until the new rules and regulations and procedural instructions necessitated by the passage of the 1954 Housing Act were received from Washington, DiC. The letter also stated:
We had expected that such procedural instructions would be in our hands before this date, however, same have not been received. If such instructions are not received on or before the expiration of this commitment you will be protected nevertheless in this instance, [in]' *854 that if under the new rules and regulations and procedural instructions it is found that the commitment can be extended as required, the customary re-opening fee of $.50 per thousand will be waived.
56. By letter of September 27,1954, the City Attorney of the City of Fairbanks rendered an opinion to Swanson affirming the validity of the lease between the city and plaintiff. The City Attorney concluded that Cole’s instructions to him to draw the lease in favor of plaintiff, and his subsequent execution of the lease as president of plaintiff, in effect constituted a representation that he had assigned his rights under the ordinance to the plaintiff. He concluded that Cole would be estopped from claiming that there had been no assignment.
57. On October 1, 1954, the FHA commitment expired. It was never thereafter renewed.
58. During early October 1954, the FHA Alaska Director became concerned about the economic feasibility of plaintiff’s entire project in view of the then changed housing situation in Fairbanks where housing of the type represented by plaintiff’s project was no longer scarce. In a letter of October 18,1954, to Rockwell, he stated:
Frankly, the entire project as of now has me in a quandary. The housing situation in Fairbanks is not too healthy with vacancies in our 608’s and Bentley Island. What it will be in another year or so is anyone’s guess. We, of course, hope for the best but I’d hate to think we would eventually have it on our hands.
J|i # Jfi * *
I realize we have a commitment, but by the same token, we’re here to protect the interest of the Government and under the regulations I am empowered to do just that. I would, of course, refer the matter (with justification) to Washington before issuing any directives or refusals.
59. (a) Although Hardy had, subsequent to Swanson’s letter of July 6, 1954 (finding 50), submitted to Swanson some of the documents referred to in such letter and which were a prerequisite to the closing of the loan, as of October 25,1954, the supplementary agreement that had been drafted and redrafted by Swanson still remained unexecuted by the Cole group and, consequently, by the Rushlight group also *855 (which, was to sign the agreement after execution by the Cole interests), thereby preventing the closing. Thus, the entire 1954 building season had been lost.
(b) On October 22,1954, Hardy conferred with Swanson to see if some means could not be worked out of proceeding with the project inasmuch as it appeared that further progress on the project would be blocked if FNMA continued to require execution of the supplementary agreement by the Cole interests. Hardy stated that the Rushlight interests would execute a form of such agreement containing all the covenants of the outstanding draft and which would include an indemnity on their part to FHA and FNMA without qualifications. As a result Swanson concluded FNMA could proceed on that basis. Accordingly, he undertook the drafting of a new form of such agreement containing such an indemnity by the Rushlight interests. It was recognized at the conference, however, that closure could not take place until the matter of the expiration of the FHA commitment had been cleared up. In an attempt to facilitate matters, however, Swanson suggested that, pending FHA’s decision, Hardy proceed to commence submitting the balance of the formal documents required for the closing. For this purpose, Hardy and Swanson reviewed in detail Swanson’s letter of July 6,1954 enumerating such documents. As a result of such review and discussion, Swanson agreed to waive certain of the requirements contained in such letter.
(c) By memorandum of October 25,1954, to Reid, FNMA’s General Counsel and Vice President, Swanson stated that if the new form of supplementary agreement would be executed containing an indemnity by all the “responsible parties and firms,” and in view of the further protection offered by the title insurance “issued by the insurers with full knowledge of the facts surromiding the transactions,” as well as by the letter dated September 27, 1954, from the City Attorney for the City of Fairbanks affirming the validity of the lease from the city to plaintiff (despite the apparent breach of the lease by the filing of the liens), it appeared that FNMA should have no further objection to closing the loan, provided all the remaining loan documents were submitted in satisfactory form. The memorandum closed as follows:
*856 I am confident that with Mr. Hardy’s cooperation, developments from here on will proceed with comparative rapidity toward the loan closing. There are still a number of things to be done by the borrower and a number of documents yet to be received by FNMA.
(d) By letter of October 26, 1954, Swanson sent to Hardy a revised draft of the supplementary agreement, containing the indemnity provisions, for execution by the Rushlight interests (but not by any of the Cole group). The letter closed as follows:
The matter concerning the dismissal of the mechanics’ and materialman’s lien actions will receive our further consideration and will be provided for later when it appears that the subject mortgage loan is otherwise in order to be closed.
The enclosed supplementary agreement was to be signed by the Rushlight Automatic Sprinkler Company, The A. Gv Rushlight Company, Irving, W. A. Rushlight, Moorland Contractors (by each of the three joint venturers), Tice Electric Company (by each partner), and.the plaintiff.
60. By letter of October 29,1954, the FNMA Los Angeles Field Office inquired of the FHA Alaska Director concerning the status of the FHA commitment.
61. (a) Promptly after his meeting with Swanson (finding 59(b)), Hardy commenced submitting, or causing to be submitted, many of the remaining documents required for the prospective closing, including a letter of November 1, 1954, from the Fairbanks’ City Attorney which gave assurance that the city considered the lease with plaintiff to be “in full force and effect” and that it had not “exercised any right which it may have to declare a forfeiture of the leasehold term by virtue of the existence of certain mechanics’ and ma-terialmen’s liens in contravention of paragraph 5 of said lease.” The supplementary agreement was also executed’ on November 1,1954, and submitted to Swanson by Hardy’s letter of November 3,1954, which letter stated in part, with respect to the lease:
* * * paragraph 21 of the Lease * * * provides that the City must give written notice of defaults and the Lessee has 60 days after said notice * * * within which to correct those. Accordingly, it is our feeling that the Lease *857 is * * * in full force and effect and will remain that way until the City gives a notice which we have been assured will not be given as long as there is any hope of F.N.M.A. proceeding with this project.
(b) There is no showing that, assuming the FHA. commitment would be extended, plaintiff thereafter would not have been able to submit to Swanson, in form satisfactory to FNMA, all the then outstanding documents which FNMA was requiring as a prerequisite to the closing, including a title insurance policy.
62. (a) As shown, the FHA commitment had expired on October 1,1954, and the FHA Alaska Director took no further action with respect thereto until the receipt by him of the agency’s new Administrative Rules and Regulations and procedural instructions issued after the passage of the Housing Act of 1954. However, even after the receipt of these data, the Director was still unclear as to how to proceed in plaintiff’s case. By letter of November 5, 1954, to the Deputy Assistant Commissioner of FHA in Washington, the Director sought advice as to whether to extend plaintiff’s commitment, stating that in reviewing the new materials, “we do not find any specific instructions with respect to such extensions.” The Director noted the regulation which stated that “A commitment may be renewed in such manner as the Commissioner may from time to time specify” but further stated that:
* * * As we interpret the Regulations, we have concluded that since the passing of the Housing Act of 1954 the * * * project must of necessity be reprocessed since the project has not yet been initially endorsed and which commitment had been issued pursuant to Regulations in effect prior to the new Act and has expired.
The letter closed as follows:
We shall appreciate the kindness of your review of this matter and advise this office your interpretation of our position with respect to the continuation of extending the commitment issued prior to the new Act, or to advise us if our interpretation is correct in that it must be returned to Underwriting for reprocessing in accordance with Regulations currently in effect. If reprocessing is required, we shall appreciate further information regarding what fees might be involved. This *858 being an unusual case without prior precedence, it is difficult to relate the new Regulations to this matter.
(b) On the same day, the Director replied to FNMA’s inquiry of October 29, 1954, stating he could not advise concerning an extension of the FHA commitment until he heard further from Washington.
(c) Also, by letter of the same date from Portland FHA Attorney-Adviser Rockwell to the Director, Rockwell pointed out the unusual situation that had arisen by reason of the foundation work performed by plaintiff in 1953 being subjected to the deterioration of two Alaska winters (since it was then plain that no further construction work could now be performed in 1954), and the consequent necessity of a re-inspection before work resumed. He stated:
* * * This question has never arisen before to’my knowledge because of the fact that in no other case has there been such an extremely long period elapse between commencing construction and initial endorsement of the credit instrument.
H< ❖
As I view the situation, the Administration has an outstanding commitment to insure the mortgage on the * * * project, and since permission has been given to commence construction prior to initial endorsement, and the commitment has not expired, the Administration is obliged to insure the mortgage when its conditions and requirements have been met, notwithstanding the fact that there appears to be some question as to the need for additional housing in the Fairbanks area.
(d) Rockwell was in error concerning the expiration of the commitment. Apparently he did not know that the commitment had not been extended beyond October 1,1954.
63. By letter of November 9, 1954, the FHA Deputy Assistant Commissioner in Washington advised the FHA Director for Alaska that the FHA “in reissuing commitments or extensions regards this as a ‘new deal’ ” and that “while we will consent to the reissuance it is our intent to incorporate the provisions of the Housing Act of 1954 * * including “Certification of Cost procedures” and compliance with a new form of Certificate of Incorporation. He further stated that “In an emergency, closing would be *859 permitted by the use of the old Certificate of Incorporation provided an enforceable agreement was obtained satisfactory to yourself and our closing attorney that the mortgagor corporation would be bound by the terms of the new charter and would amend their old charter to conform therewith.”
64. By letter of November 16, 1954, the FHA. Alaska Director advised the FNMA Los Angeles Office (with a copy to plaintiff’s representative) that, since the FHA commitment had expired “further extensions thereon cannot be made without complete reprocessing in this office * * * pursuant to provisions of the Housing Act of 1954 * * *’” (no further fees, however, being necessary), including a new Certificate of Incorporation. The letter went on to state that “Should you desire to request reopening of this project,” certain documents would have to be submitted to FHA. “to facilitate our processing toward reissuance of the commitment,” including a new Application for Mortgage Insurance with supporting documents. The letter closed as follows:
As stated above, the commitment covering the cautioned project is now considered to be expired and is subject to reopening requirements, except that the reopening fee will be waived. This project can be given further consideration only upon receipt of the foregoing exhibits in reprocessing analysis.
65. (a) On November 22,1954, Hardy and his clients, the Rushlight group, including Rushlight himself, held a conference in Portland, Oregon, to discuss the requirements set forth in the FHA AJaska Director’s letter of November 16, 1954, which conference was attended by FHA Attorney-Adviser Rockwell. During the course of the conference, Rushlight stated there had been a considerable advance in construction costs in the Fairbanks area since the FHA commitment had been originally issued and directed that the project be reanalyzed from a cost standpoint. Rushlight felt that if the increased costs of completing the project would exceed the amount they had already expended, it might be more prudent to abandon the project.
The group also discussed the question of the most expeditious procedure of bringing the project under the 1954 *860 Act in the event plaintiff decided to proceed with the project and, in this connection, Rockwell expressed the opinion that an agreement between plaintiff and FHA whereby plaintiff agreed to comply with all the provisions of the Act and FHA’s new Administrative Rules and Regulations to be issued thereunder would suffice.
(b) By letter of the same date to the FHA Alaska Director, Hardy stated that since November 1958 plaintiff had done “everything possible to get this loan closed”; that FNMA had “indicated that upon furnishing certain documents and meeting certain conditions they would be willing to consider the closing” of the loan; that plaintiff had just sent to FNMA “the last of the documents required for their consideration in making their determination as to issuing their commitment”; that “one of the reasons” entering into FNMA’s willingness “to loan on this project is the fact that the notes and mortgages and other documents necessary have been approved by the stockholders” of plaintiff “at their annual meeting on August 30, 1954”; that if “the reprocessing required by FHA should entail new notes, mortgages, corporate resolutions and the like we probably should be faced with such undue delay that the construction season of 1955 would be gone before we could proceed”; that plaintiff “and all of the persons financially interested in the project are, of course, not only willing but anxious to comply with all the new requirements of the 1954 Housing Act”, and that plaintiff’s purpose was “not to avoid those requirements but to see if they cannot be met in a manner which will not unduly delay this project.”
Hardy then went on to suggest that FHA “give consideration to issuing an extension of the existing commitment” on a basis whereby the sponsors of the project would enter into an agreement with FHA “requiring the sponsors” to' (a) amend plaintiff’s articles of incorporation so as to conform with the requirements of the 1954 Housing Act, (b) to increase the sponsors’ cash working capital (from 1%% to 2%), and (c) to abide by new Department of Labor prevailing wage determinations. In addition, plaintiff offered to furnish FHA other data bringing previous information up-to-date, such as proof of the current status of the lease as *861 well as such, personal financial and credit statements as FHA desired.
Hardy closed by stating:
It is our opinion and the opinion of the local F.H.A. attorney, Mr. Harry Rockwell, that from your legal standpoint these [agreements and submissions] would as effectively bind the sponsoring corporation to comply with the 1954 Act as would a reprocessing of the entire matter, and we should add that Mr. Rockwell stated, however,, that the question of whether the agreement method is used or the formal reprocessing method is a question for the underwriting and administrative departments of F.H.A.
66. By letter of November 30, 1954, to the FHA Deputy Assistant Commissioner in Washington, D.C., the FHA Director for Alaska submitted the proposal of the plaintiff that the commitment be reinstated pursuant to an agreement on the part of plaintiff to comply with all the new requirements under the 1954 Act and stated that Rockwell had advised that, from a legal standpoint, the commitment might be so reinstated and an initial closing effected by such a special agreement. The Director further stated that:
It would seem that since the commitment was issued almost a year and a 'half ago, that further extensions of this commitment should not, in the realm of reason, be continued even if same could be accomplished by agreement as proposed. First of all, as we understand the regulations, a commitment issued prior to the Housing Act of 1954 cannot be extended but must be reissued; and, secondly, it is felt that we should have a “relook” at the project in view of the time lapse.
Mr. Hardy has stated that if reprocessing is necessary they would be faced with such undue delay that the construction season of 1955 would be gone before they could proceed. We cannot reconcile their thinking in this matter, as it would seem reasonable that under normal circumstances there would be plenty of time to effect closing resulting from reprocessing before the next construction season there being nearly five full months ahead of them.
We shall appreciate your giving consideration to the foregoing and advising this office, by wire if you can, if you feel in light of the information before you that the closing can be accomplished by agreement.
*862 ,67. (a) By letter of December 1, 1954, to Hardy, FNMA Agency Counsel Swanson advised that “it now appears that until the requirements of the Federal Housing Administration have been satisfactorily met there is little more that we can accomplish from this end,” but that, in the meantime, he would review his files “so that during the interim we can tie up any loose ends that may remain and advise you of any further action that will be required in this case.”
(b) On the same day, Swanson sent a memorandum to the FNMA Vice President and General Counsel in Washington, in which he advised that the closing of the loan had been delayed because of problems relating to the FHA commitment “and until either the complete reprocessing required by FHA, or any modifications thereof the sponsors might obtain, has been satisfactorily accomplished, there is little that this office of FNMA can do to effect the loan closing”; that “it appears that the requirements of this Association, as expressed in our original loan authorization,” as supplemented, “either have been or will be substantially complied with * * and that, except for the FHA problem, he did not anticipate any further difficulties of a substantial nature in connection with the closing of the loan.
68. By letter of December 16, 1954, the FHA Deputy Assistant Commissioner in Washington, D.C., advised the FHA Director for Alaska (and Attorney-Adviser Rockwell), in reply to the Director’s letter of November 30, 1954 (finding 66), that he concurred in Rockwell’s opinion that “the original commitment in this case could be reissued under an agreement to the effect that such renewal would bring the project under the provisions of the Housing Act of 1954.” He further stated that “It is clear that the proceedings from here on should be under the provisions of the Housing Act of 1954” and that “I agree with you in your views that the reprocessing should cause no undue delays.”
69. (a) As an incident of the FHA “reprocessing” of plaintiff’s application under the provisions of the Housing Act of 1954, the FHA Alaska Director felt it necessary to institute a new investigation concerning the current need for additional housing in Fairbanks of the type called for by plaintiff’s project. Accordingly, on December 30, 1954, he *863 directed a telegram to FHA’s “Market Analyst” in San Francisco, California, stating that in connection with the reprocessing of plaintiff’s project, he desired the Analyst’s immediate “opinion and analysis,” as to whether the Fairbanks rental market would then stand 200 additional units of the type plaintiff proposed to construct.
(b) Actually, from September 30, 1954 and continuing at all times thereafter material herein, the FHA housing surveys for the Fairbanks, Alaska,- area had revealed that the housing project here involved was not required.
70. (a) In accordance with his understanding that, in order to permit closing under the previously issued FHA commitment, plaintiff would have to execute an agreement to the effect that it would be bound by the provisions of the Housing Act of 1954, Rockwell prepared such an agreement, which plaintiff executed, and which Rockwell forwarded to the FHA Alaska Director by letter of January 4,1955. However, Rockwell advised that, since this agreement was executed by the mortgagor only, but FHA’s commitment is technically issued to the mortgagee (FNMA) on condition that the mortgagor must meet certain requirements, FNMA should manifest its acceptance of the new arrangements necessitated by the 1954 Housing Act and the revisions in the documents to be submitted to FNMA which FHA would now require.
(b) The agreement, dated January 4,1955, read as follows:
Whereas, on June 3, 1953, the Alaska Insuring Office of the Federal Housing Administration issued a commitment for insurance upon completion of a certain rental housing project located in Fairbanks, Alaska, and designated Project Number 130-00019, Moorland Court, Inc., which commitment provided for insurance of construction advances; and
Whereas, with the consent of the mortgagee named in such commitment and also the Federal Housing Administration construction of the project was undertaken during the month of August, 1953, on the understanding that the initial closing of the mortgage insurance transaction would be accomplished within a reasonable time thereafter; and
_ Whereas, due to certain involvements and complications beyond the control of the principal sponsors such initial closing has not, as yet, been accomplished; and
Whereas, the National Housing Act, under which *864 such commitment was issued, was further amended by enactment approved August 2,1954, the effect of which was to change various requirements of the Federal Housing Administration, limiting, among other things, the period within which initial closing could be accomplished on outstanding commitments; and
Whereas, notwithstanding the fact that the said commitment has now expired,, the mortgagor is desirous of accomplishing initial closing, completing the constriction of the project, and complying with aU of the requirements of the National Housing Act as amended, including the amendment of August 2, 1954, and the Administrative Hules and Regulations issued pursuant thereto.
Now, Therefore, in consideration of the Federal Housing Administration reissuing the hereinabove mentioned commitment, the undersigned mortgagor agrees that said commitment when reissued shall be construed to be subject to all of the provisions of the National Housing Act, as amended to and including the amendment of August, 1954, and to be bound by all of the terms and conditions thereof including the Administrative Hules and Kegulations and requirements issued and promulgated pursuant to such statute as amended, and that it will, upon the reissuance of such commitments, undertake compliance with all of the new requirements including, but not limited to, the amendment of its corporate charter to conform to the present requirements of the Federal Housing Administration, the revision of the various closing papers heretofore executed, and to execute such additional papers and documents as may be required to make the above mentioned mortgage loan eligible for mortgage insurance under the National Housing Act, as now amended, it being the intention and purpose of the mortgagor in obligating itself as herein provided to induce the Federal Housing Administration to reissue said commitment.
(c) Thereafter, plaintiff’s representatives, in order to effect the contemplated closing, promptly and diligently commenced submitting to Rockwell, in accordance with instructions and forms furnished by Rockwell, as well as by FNMA Agency Counsel Swanson, new required forms of documents, including amendments and supplements to documents that had been previously submitted. Separate and apart from the question of economic feasibility or justification of the project, and considering only the submission of appropriate docu *865 ments, such as notes, mortgages, bonds, title insurance, corporate resolutions, articles of incorporation, bylaws, opinions of counsel as to legal validity, etc., there is no showing that plaintiff did not or would not at this time have been able to satisfy the technical requirements of both FHA. and FNMA.
71. (a) By memorandum dated January 7,1955, the FHA Market Analyst, responding to the FHA Alaska Director’s inquiry of December 30, 1954 (finding 69), advised that the Fairbanks rental market had already deteriorated, with still declining future prospects.
(b) By telegram of January 17,1955, to the FHA Alaska Director, the Acting [Regional Director of FHA, Washington, D.C., inquired as to the status of the reprocessing of the project and stated that the Market Analyst’s memorandum “when combined with other factors may possibly render the project unacceptable.”
(c) The FHA Alaska Director, by telegram of the same date, advised said Acting Regional Director that reprocessing had not yet been initiated; that such reprocessing under the 1954 Act would result in a lower commitment by $30,000; that an additional $20,000 would be required to rehabilitate the foundations of the project (now subjected to the deterioration effects of two Alaskan winters); that the Market Analyst’s statements supported his opinion that the project should not be constructed since the Fairbanks rental market was “not too healthy” and 200 additional units would be the “straw that breaks [the] camel’s back and no doubt will result in another Commissioner-owned project,” and that “Considerable pressure via personal and telephone calls to effect closing but are standing upon December 16 letter [finding 68] until firm directive on all phases received from your office.”
72. On January 20, 1955, the FHA Alaska Director advised Hardy that there would be no extension of the original commitment nor closing thereunder and that the only thing that could be done would be to file an application for a new commitment.
73. By memorandum of January 21,1955, the FHA Acting Regional Director in Washington, D.C., advised the Alaska FHA Director that “the commitment for insurance previously issued * * * has expired and the proposal now as *866 sumes the status of a new application”; that “therefore, it must be considered in the light of today’s conditions * * *”; that the Market Analyst’s conclusions did not justify the construction of the project “in view of the present rental unit inventory combined with the deterioration of the rental market and the alarming vacancy ratio”; that the problem “should be thoroughly explored with the sponsors since the success of the venture * * * is of material concern to them as well as to the mortgagee and this Administration”; that the sponsors should be made to understand “that reprocessing will probably result in non-acceptance for mortgage insurance” and that FHA “would prefer abandonment of the project because, in our judgment, if it were carried through to consummation, all parties at interest would suffer even greater 'loss than now experienced and this includes the proponents who will undoubtedly find it necessary to make an appreciable additional cash investment”; and that FHA was, however, “obligated to completely reprocess the case if such action is insisted upon by the sponsors, even though no commitment for insurance is issued.”
74. On January 28,1955, Hardy conferred in Washington, D.C., with the FHA Assistant Commissioner of Operations concerning the future of the project and was asked to submit a statement of plaintiff’s position.
75. (a) By letter of February 1, 1955, to Portland FHA Attorney-Adviser Kockwell, FNMA Agency Counsel Swanson forwarded for Kockwell’s approval several documents which plaintiff had submitted to Swanson in anticipation of the closing. Swanson stated that “it is anticipated that a preliminary closing at least may be scheduled in the early part of the month of February.”
(b) On that date, Hardy wrote to the FHA Assistant Commissioner to furnish the data requested in their conference of January 28, 1955 (finding 74). He reviewed the history of the project and stated:
We are briefly setting forth our contentions with respect to the existing situation. It is our opinion that under the original commitment and authority to proceed with construction, and with full compliance with all of the terms of the application to proceed, the F.H. A. became bound to extend that commitment and to close *867 thereunder. Our client, of course, would never have proceeded with this project without that type of a commitment, since it could not run the risk of having to suffer a tremendous loss as is now suggested. Furthermore, we believe our opinion is substantiated by subsequent events, including the authorization out of Washington to execute an agreement to be bound by the 1954 Act in order to be able to close under the original commitment. Our client, acting in reliance thereon, executed and has delivered to F.H.A. the supplemental agreement referred to which is now held by F.H.A.
All F.H.A. requirements that have ever been set forth have been met, the construction has taken place, our client is ready, willing and able to proceed, and it is our opinion that the F.H.A. Administrator is bound to issue the commitment. If after the commitment is extended and the F.H.A. decides during any phase of the construction that it prefers not to proceed further it is of course at liberty to negotiate with the sponsor and the contractor for the termination thereof.
In the event that a determination is made to force our client to suffer the loss of all construction to date, we will of course be obliged to protect their interest by appropriate action to enforce compliance under the original commitment.
_ We trust that you will give this your immediate consideration so that this matter can be determined quickly in light of the approaching construction season.
76. (a) On February 11, 1955, a conference was held in the office of FHA’s Assistant Commissioner for Operations in Washington, D.C., attended by said Assistant Commissioner and six other FHA officials, including Coulter. After a review, it was concluded that the project should not proceed because of the then lack of demand for apartment accommodations in the Fairbanks area and the FHA Market Analyst’s pessimistic report as to a potential market. Information was sought from the Air Force and the Army as to any contemplated increased activity on their part in the Fairbanks area which might generate a demand for housing accommodations but both departments advised they had no such plans. The Agency’s legal representatives at the meeting had no objection to the conclusion not to proceed since they felt that the decision was an administrative, and not a legal, matter.
*868 (b) That day, the FHA Acting Regional Director in Washington, D.C., sent a telegram to the FHA Alaska Director advising that “The Administration has determined not to proceed farther in this case. Therefore you are to act only upon specific instructions from this office.”
(c) Meanwhile, FNMA had apparently not been kept currently advised by FHA of its strong doubts concerning the feasibility of proceeding with the project, and on the same day, FNMA Los Angeles Agency Counsel Swanson telephoned plaintiff’s attorneys in Portland to arrange a closing .date. He suggested February 28, 1955, as such closing date.
(d) However, later that same day, plaintiff’s attorneys, apparently having in the interim been advised of the FHA decision, sent a telegram to Swanson advising that FNMA need not further plan any loan closing in February.
77i (a) On March 10, 1955, FNMA’s Loan Manager in Washington, D.C., sent a memorandum to FHA inquiring about the status of the project. Apparently FNMA had not as yet been formally advised by FHA of its decision.
(b) In response to such inquiry, FHA’s Assistant Commissioner for Operations advised by memorandum of March 25, 1955, that “the matter of commitment extension * * * was discussed at length with people representing the corporation, and in view of current lack of market demand and lack of any evidence that a future market demand would arise, it was determined not to extend the commitment.”
78. By letter of April 11, 1955, FNMA formally notified plaintiff and Washington Mortgage & Insurance Company that in view of FHA’s decision “not to extend or renew” the FHA Commitment for Insurance, “you and each of you are notified hereby that the aforesaid loan authorization issued by this Association, is hereby revoked, cancelled and terminated * * * effective immediately.”
79. (a) By letter of May 4,1955, Taylor, the attorney for the Cole interests, advised FNMA that “We have heard that FHA or FNMA has agreed to pay Rushlight Company the sum of $200,000.00 for work they alleged to have done on the project, or that negotiations are in process of securing said sum”; that plaintiff’s directors were the three Coles, Bell and Taylor; that Cash Cole was plaintiff’s president and Mrs. *869 Cole plaintiff’s secretary and treasurer; that Cash Cole had personally expended approximately $12,000 in promoting the project; that the assignment of the shares to Rushlight was made “in consideration of Rushlight’s proceeding with the project” and that since “he did not so proceed, the stock transfer was cancelled by the Board of Directors at a meeting held November 10, 1953”, so that “Rushlight Co. holds no stock in Moorland Court, Inc.”; that there were liens pending against the project; and that Cole, the original lease owner, “has been greatly damaged by the action of A. G. Rushlight Co., in constructing upon said land certain concrete foundations that have depreciated the value of the land.”
The letter closed as follows:
If any settlement is made with Rushlight Company, the claims of Cole and the lienholders should be protected. Rushlight agreed with Cole that, in the event the project did not go through, the stock held by Rush-light Company would be returned to Cole, as the stock transfer was only temporary during construction.
It is hoped that this matter will be fully investigated and that justice may be given all parties.
(b) The record does not indicate that there has been any adjudication by any Alaska court having jurisdiction over such matters of the validity of the Cole claims as set forth in this letter.
80. (a) On June 21, 1955, plaintiff commenced a civil action in the United States District Court for the District of Oregon against Norman P. Mason, as Commissioner of FUA, which action was assigned Civil No. 8147, in which plaintiff claimed that FUA’s refusal to renew and extend its commitment constituted a breach of contract for which plaintiff was entitled to damages.
(b) By an opinion rendered February 5,1959 (as amended March 16,1959), District Judge East decided that “Title 12 U.S.C.A. § 1713 defeats plaintiff’s cause in this action.” The court held:
As of August 2,1954, there was no final binding commitment between the parties to insure any mortgage loan transaction initiated by the plaintiff. The defendant’s later decision that it would not again extend the original *870 90-day commitment for insurance and would not, in effect, insure any loan tbe plaintiff might acquire, was a decision entirely within the defendant agency’s discretion and prerogative. The defendant did, in fact, to the Court’s mind, give the plaintiff ample opportunity to arrange its affairs and close a mortgage loan transaction agreeable to the defendant.
From a careful reading of all the evidence presented, it appears to the Court that, although no legal liability fastens on the defendant agency for the moneys expended by the plaintiff, it is evident that certain officers of the Federal Housing Administration and the Federal National Mortgage Association led the plaintiff into a false sense of security.
However, the court reserved judgment concerning an inspection fee which plaintiff had paid to FHA. Subsequently, the unused portion of the inspection fee in the amount of $12,000 was returned to plaintiff by FHA and the district court action was dismissed with prejudice on a stipulation dated March 26,1959.
■81. (a) On May 11, 1961, there was introduced in the Senate, 87th Congress, 1st Session, Senate Bill S. 1845, which read as follows:
A Bill
For the relief of Moorland Court, Incorporated.
Be it enacted by the Senate and Home of Representatives of the United States of America in Congress assembled, That the Secretary of the Treasury is authorized and directed to pay, out of any money in the Treasury not otherwise appropriated, to Moorland Court, Incorporated, the sum of $380,556.76 in full satisfaction of all its claims against the United States for compensation for losses which it sustained in connection with the partial construction of a rental housing unit at Fairbanks, Alaska, which it started in 1953, but was forced to discontinue because of its failure to obtain a Federal Housing Administration insured mortgage, such construction having been started by Moorland Court, Incorporated, in reliance upon alleged assurances given by certain officials of the Federal Housing Administration that the application filed by Moorland Court, Incorporated for an insured mortgage would be approved: Provided, That no part of the amount appropriated in this Act in excess of 10 per centum thereof shall be paid or delivered to or received by any agent or attorney on ac *871 count of services rendered in connection with this claim, and the same shall be unlawful, any contract to the contrary notwithstanding. Any person violating the provisions of this Act shall be deemed guilty of a misdemeanor and upon conviction thereof shall be fined in any sum not exceeding $1,000.
(b) On September 7,1961, the Senate, 87th Congress, 1st Session, agreed to Senate Resolution 144, which read as follows:
Resolved, That the bill (S. 1845) entitled “A bill for the relief of Moorland Court, Inc.”, now pending in the Senate, together with all accompanying papers, is hereby referred to the Court of Claims; and the court shall proceed with the same in accordance with the provisions of sections 1492 and 2509 of title 28 of the United States Code and report to the Senate at the earliest practicable date.
(c) On December 12, 1961, plaintiff’s petition herein was filed.
82. (a) The joint venture Moorland Contractors expended $299,539.44 on plaintiff’s behalf pursuant to the authorization to proceed with construction in advance of closing. Of said amount, $127,465.39 was expended by Eushlight Automatic Sprinkler Company, $111,446.91 by A. G. Eushlight Company, and the remaining $60,627.14 by the Tice Electric Company. Plaintiff is indebted to Moorland Contractors in said amount of $299,539.44.[1]
(b) The above amount owed to Moorland Contractors does not include an allowance for home office overhead of Moorland Contractors and plaintiff claims (on behalf of Moorland Contractors) an arbitrary amount ($14,696.01) which equals approximately 5 percent of said $299,539.44. However, the record is not sufficient to support an allowance in said amount or in any amount for such item of claim. Indeed, the proof does not indicate with certainty that the joint venture Moorland Contractors even had a home office.
(c) In addition to the amount for which it is indebted to Moorland Contractors, plaintiff made expenditures or incurred other indebtedness allocable to the project in the *872 amount of $51,829.38, making the total amount of $351,368.82[2] which plaintiff expended or for which it is liable to others with respect to the project.
83. Pursuant to an opinion of the United States Court of Appeals for the Ninth Circuit on June 23, 1961, the United States District Court for the District of Oregon entered a judgment on October 2, 1961, in favor of the United States and against Rushlight Automatic Sprinkler Company in the amount of $8,560.71, plus interest at 6 percentum per annum from November 6, 1959, and costs, assessed at $40.20. Said judgment was rendered with respect to an erroneous tax refund that had been made to the company. No money has been paid on account of this judgment.
84. No part of the sum of $351,368.82 set forth in finding 82 (c) has ever been paid by defendant to plaintiff or to any other person for or on behalf of plaintiff. Plaintiff is the owner of the claim having made no assignment or other transfer thereof, either in whole or in part.

 This case was referred to us and some preparation was made by the parties prior to the Supreme Court decision in Glidden Co. v. Zdanok, 370 U.S. 530 (1962). We therefore think it proper to file this report without reference to the Supreme Court’s opinion in that ease. Consequently, defendant’s suggestion of lack of jurisdiction to entertain the case is rejected.

 28 U.S.C. § 2501 (1964 ed.)

 In the Fairbanks area it is as a practical matter only possible to carry ■on construction work of tbe proposed type here during the period of late ■spring to about the third week of November.

Plaintiff liad become officially incorporated August 31, 1953.

 There Is dicta In the Oregon District Court decision that states that plaintiff was led into a false sense of security. We are unable to concur in that position.

 Defendant Ras claimed a tax setoff against plaintiff, -which plaintiff has agreed to in the event recovery is given. In light of our decision, however, the point has become moot.

 These figures were those stipulated during the trial. Transcript pp. 46-47.

 This figure is composed of the amount of 5345,425.75 appearing on the last page of Commissioner’s Exhibit 3, “Stipulation as to Accounting data,” in the column headed “Deft’s Audit After Adjustment” plus the two figures of $3,693.07 and $2,250 set forth on page 2 of said exhibit